Carroll et. als
vs.
Carroll et. als

Case 1:05-cv-11670GAO

FILED
IN CLERKS OFFICE

Answer and Argument

1. After review of an overview of some of the history and tortious / criminal and outrageous

conduct directed upon the plaintiffs, the court should conclude that there are many issues

on which relief should be sought. The court should realize that irrepairable harm has occurred

with highly egrigious activities which should be self evident with the facts, documents and the

law and witnesses.  This is a divorce gone amuck where many individuals exploited a family

dilemma for their own greed and satisfaction, aiding injury and abuse upon the plaintiffs to

defraud them.  The court has been presented a certified divorce decree upon initial filing and

the clerk would only accept the this document, although others were offered. The court now

questions documentation to support claims. The documents such as the Permanent Injunction,

a brief of David Fulmer reducing to writing that the activities of the defendants are all fraud

and documents showing the criminal activities with the defendant James J. Carroll, Jr. and

particularly deputy sheriff Donnelly as well as Orders devised to obstruct and threaten

are being presented. There are far too many documents to adequately show the entire picture

in one brief and the plaintiffs do not wish to overwhelm this court. Additional documents needed

for review of the court will be submitted upon the request of the court.

Rooker Feldman Doctrine Argument

2. No decision in law is legally enforceable when it is based on fraud and crime and or prohibited

by preexisting law or if it undermines valid final court orders that superceeded any action that

was already prohibited by law. Succinctly stated a contract for prostitution is a void contract

since prostitution is illegal, so if the law prohibits an action, nothing in the form of any court

order valid or invalid, fabricated or legitimate can make a nullity into a valid binding basis, nor

are such actions allowed to overstep the law, because it is then a crime, especially when it was

intentionally devised.  The fact remains that matters that are legally prohibited by law are said to

2. Cont'd. be unenforceable by the courts and law enforcement regardless if the decisions are procurred through a state court or any other court. Noone can collude and seek the aid of people who can help them break the law and then assert that their rights, their unlawfully gained decisions and their fraud with false documents, coercive acts, illicitly procured gain with deprivation of Constitutional Rights is a superior and proper position over those who already properly held those rights and the law in their favor. When something is void by operation of law, contradictory decisions regardless of how obtained and related actions are equally void and therefore become crimes when actions are a violation of criminal statutes and were actions that occurred through a scheme regardless of who the players are and how devised. No justice or member of the law has "license" to break the law, and negating immunity, the state continues to have liability as well as all others who contributed to the injuries No person regardless of position or privelege is allowed to deprive any U.S. Citizen of their Constitutional Rights and protections and then call it law merely because they have the ability to do so. A pen in the wrong hands is a sword and can amount to abuse of power when actions are allowed to be devised unchecked and unchallenged. When a court or any member of the law is involved in conducting crimes and abuses against American Citizens and all remedies are stripped away and intentionally obstructed then clearly the powers of a state are being used to deprive Constitutional and Civil Rights. When these actions are part of an ongoing course of conduct, then it becomes pattern and practice.

The Rooker Feldman Doctrine is comprised of two cases heard sixty years apart from each other. It is an archaeic statute which is heatedly debated and the U.S. Supreme Court has found issues with the doctrine as being improperly decided. The doctrine addresses members of the law who hold immunity from suit, but immunity applies to "lawful activities" within the scope of lawful authority and lawful duties not unlawful activities. The doctrine is supposed to prevent mere civil suits as reprisal for administrated actions of lawful duties. The key phrase is lawful duties.

2 cont'd. Therefore, although immunity may be an issue of debate, it does not preclude actions in the U.S. District Courts for "liability" or torts where grounds and law allows such actions. Although the court has raised the immunity defense no justice has been enjoined to this proceeding.

No state court is allowed to overstep Federal Law which is Supreme over state and no state court is allowed to deprive and abridge the Constitutional Rights and protections of United States Citizens just because they have been entrusted with power and the delegation and enforcement of the law. If the U.S. District Court was to uphold a standard that a Justice and any law enforcement officer or elected official was entitled to be corrupt, malicious, a tyrant or a criminal without any form of accountability, it would become the position of choice for sanctuary for organized crime and therefore would allow any honest citizen to be a target for any injury desired by those who wanted to misuse their power. Our forefathers fought King George against such tyranny and Congress never legislated any law which made justices, elected officials and law enforcement above the law. These individuals are supposed to be public servants to serve and protect, not aristocrats to rob, assault, injure and pillage.

The law was not designed to fabricate controversy, stage, devise and predecide the decisions on meritless and prohibited litigation with no foundation, deny access, deny redress and accountability and then enforce and enact crimes and abuses against the intended victims to favor all those who were part of the connected favored group where all could benefit from enforcement and maintainence of their plot. When the law is subverted for criminal gain and criminal enterprise such as violations of the RICO statutes, the argument in favor of Rooker Feldman Doctrine becomes voidable. The U.S. District Court has raised questions which should not be at issue when Federal Law has been overstepped and most if not all Constitutional Rights and protections have been stripped from the plaintiffs. [Emphasis]

The mere deprivation of Free Speech under the First Amendment, the right to access to the courts

2 cont'd. and be heard, the right to secure one's rights and Freedoms under the Constitution

should not be an absolute right for any state to abolish or abash the Constitution and make any

person a hunted fugitive without ever committing a crime thereby depriving them of life, liberty

and property with no legal basis. The Fourteenth Amendment of the United States Constitution

provides that a State shall not deprive any person of life, liberty or property without due process

of law.

The plaintiffs jointly and severally contend that this has occurred with fabricated matters that

have no basis in law and were created to usurp the valid law and valid orders of the appropriate

courts which again were long past adjudication and were final orders [Emphasis] 14 s 1.

In 42 U.S.C. s 1983, Congress had created a Federal Cause of Action for the deprivation of any

rights, priveleges, or immunities secured by the Constitution and laws. [Emphasis]

3. Denial of all Constitutional Rights and Protections including redress, a fair untainted and

unbiased hearing, the ability to receive due process and receiving proper notice with a speedy

trial should be of great concern to the District Court. We the plaintiffs, Josephine M. Carroll and

James J. Carroll, III, jointly assert that the Commonwealth of Massachusetts has not afforded us

these rights on a regular basis. Of course the U.S. District Court may find this allegation difficult

to comprehend and perceive as valid, but clearly this is not the first case to involve the same

group of defendants and many more not named who participated where the same or similar

events transpired with other victims.

4. The U.S. District Court is most certainly aware that justice may not always be found in every

court of law and or every community and issues of corruption have been a fact in select areas of

this country, noted through various cases that the F.B.I. has prosecuted. One such example is

"Operation Wig." Proper and valid enforcement of the law with a valid foundation

in law as the law was intended to be upheld and enforced should be a basic entitlement,

something that the Federal Courts have reviewed as a prerequisite of their decisions as to what

4 contd.  are entitlements as a matter of state law and therefore a basis for making a Federal

decision.  A denial of all of these basic rights and principles should be of great concern to this

court and are a defense against the Rooker Feldman Doctrine.

The Rooker Feldman Doctrine has been debated in many Federal cases. The Supreme Court has

dissented on the Rooker Feldman decisions finding them improperly decided and applied.

The plaintiffs strongly assert that Rooker Feldman Doctrine does not apply to this case.

Clearly, no justice has been enjoined to this action.

Crime is not allowed to be a replacement for law or allowed to be enforceable as "law".

5. Fraud or claims of ignorance are not defenses against intentionally created schemes and

nullities  with multiple conspiracies to steal assets, working legally void decisions actions, plots

and staged matters to target innocent victims to then deprive them of their assets, subsistance,

shelter, rights and their property capitalizing on their marital status, their poor health, age, gender

and financial status. This activity remains unlawful especially when all was prohibited by law, by

existing court orders and awards and therefore regardless of how many layers of fraud anyone

devises, no matter how complex issues are made to hide crime and torts, all that is based on fraud

and crime is void by operation of law and remains crimes, torts and fraud and the complexities

added to confuse are issues of concealment not valid orders or decisions or law.  No alleged legal

decision or legal process allows the activities presented to this court.

If the initial basis or foundation in law is void, then all that follows is equally void.

6. The U.S. District Court is making assumptions that ill gained orders and decisions were all

legally and properly secured. The plaintiffs have found evidence that documents with networking

relationships have created many false documents including those used to defraud the U.S.

Federal Government as aforementioned.  When false papers and fabricated events to make an

appearance of legal proceedings has occurred, these matters made to appear as legitimate actually

have no foundation in law and again are crimes regardless of how devised.

6 cont'd. To emphasize that point, when a Permanent Injunctive Order exists, leave of the Court is required for any litigation to occur thereafter. Final and permanent orders can not be overstepped because such orders are automatically void by operation of law and no other court can overturn a final decision, an entitlement and a overstep a court of original juristiction. One can not devise false titles and then call themselves proper owners on parties never sued when they were restrained, legally prohibited and their actions are nothing but nullities then assaulting and injuring parties to make the scheme complete to steal any possibly attainable asset. That is fraud regardless of how devised and who procured it.

6. Police can not jail individuals or break into homes without any due process, probable cause or basis to do so, nor can they arbitrarily break into homes with no warrants, no legal papers, no legal basis and no legal justification and regardless of what positions any of these people hold, if a judge, police officer or any other member of the law decided to join forces with a "Meeting of the minds" and go out to lunch and while in the process rob a bank, that is a crime. It is absurd to think because they appear as upstanding members of the community, that their positions give them entitlement to overstep the law, the Constitution and the public interest as well as the alleged guaranteed rights of citizens.

A real life example of this mentality and behavior involved the prosecution of the Medford Police Officer Clemente, in U.S. vs Clemente where this rogue officer plotted with others to rob the Medford Savings Bank and was successful in removing millions of dollars of assets from the bank vault after using dynamite. The F.B.I. investigated that case and this police officer was prosecuted and sentenced to twenty years in jail. The events are similar as to the outrageous conduct, the corruption and the betrayal of public trust.

The instant case can be compared to this example as to the police and sheriff misconduct demonstrating like the foregoing example, the actions have no legal foundation and basis in law and amount to an elaborate robbery with similar players.

6 cont'd. Rooker Feldman doctrine was found not to apply in circumstances where torts occurred

arising out of a divorce action. [Emphasis] The recent Nicole Smith Trial (No cite released as of

May 3, 2006 U.S.Supreme Ct.) Involves a divorced wife allowed to seek claims in the Federal

Courts because she was denied enforcement of awards and entitlements previously awarded and

or entitled under state law and Probate Court. The instant case has some of the same elements

arising post divorce. Another such reference on this position is Ankenbrandt v. Richard, 504 U.S.

689 (U.S. 1992) "Court held that children could sue for torts arising from divorce action of

parents."

7. Under Head note 2 of the Bill of Rights (www.lexis.com/research/retrieve dates 1/01/05

through 01/01/06) following citation (reference as to locating basis only) "Halbert v. Michigan,

125 S. Ct. 2582, 2005 U.S. Lexis 5012 (U.S., June 23, 2005, Decided)"

An excerpt taken from this headnote states ; "A state may not bolt the door to equal justice to

indigent defendants. In the first appeal of right, states must appoint counsel to indigent

defendants." Neither Josephine Carroll nor James J. Carroll, III has had a day in court or

afforded such a right contradicting this statement. Negating the last sentence involving

appointment of counsel, in any event, per the divorce decree, any controversy created by the

defendant James J. Carroll, Jr. causing loss to Josephine Carroll was to be addressed by the

defendant paying counsel fees to Josephine Carroll for her defense and for recovery. Because the

defendant never met any of his legal obligations, the plaintiff is at a severe disadvantage and has

been forced to file forma pauperis due to the issues in the underlying case. Legally, the court

should assess these costs to James J. Carroll, Jr.

8. In the action before this court, the defendant James J. Carroll, Jr. his counselors agents and

third persons, which applies to anyone who sought to assist this group in defying the Permanent

Injunctive order was thereby under a Permanent mandate to stop all litigation and contact,

communication and interference of anytype. Under terms of a divorce, not only were awards

final, but this order upheld and maintained those decisions since both Superior Court and Probate

8 cont'd. Courts have lateral juristiction horizontally and are to recognize the orders of each other. The defendant James J. Carroll, Jr. never paid alimony as required by divorce decree, a contempt of court. He and his counselors and agents sought to defy the Superior Court Order as well and toppled the scales of justice in their favor with creating false documents, falsified and altered dockets and records with aid of court personnel which is a crime and no more than fraud and thereafter created a greater burden on the plaintiffs in this case with a tainted record to mislead the courts or find insiders to falsify records or create false hearings and predecided decisions and mislead the public when the claims were barred by injunction held no merit.

9. The actions regardless of how operated were barred by law and court orders because the claims arose from a divorce proceeding and were issues already tried and settled, barred by res-judicata, time barred and past appeal. Noone is allowed by law to continue to retry issues until they reach their desired result, yet this is what has been done with fraud and misuse of the system coupled with false cases and falsified docket, fabricated orders and maintained crime.

10. The defendant James J. Carroll, Jr. was without question a debtor to Josephine Carroll per the divorce decree. Congress has determined that each week of non payment of alimony is a successive contempt on which "Full Faith and Credit" is based. The defendant James J. Carroll, Jr. intentionally withheld financial subsistance to the his longtime wife the plaintiff Josephine Carroll to obtain financially control, injure his exwife while increasing her expenses and withheld funds where the divorce decree required that the defendant James J. Carroll, Jr. be responsible for any legal costs to the plaintiff Josephine Carroll. The withholding of these funds is not only a self serving strategy to obtain unjust enrichment, but was a means of domestic abuse control and gender bias where the defendant and his counselors and agents perceive women as an object ; as a weaker sex ; as less intelligent and easily conned and fooled and men as the superior sex with a King of the Castle mentality. This has been the demeanor in manipulating the process to take any asset regardless of title to basically conduct crimes and call it law while the defendants collectively ultimately unjustly enrich themselves on false documents and essentially

10. cont'd. use this fraud with networking to hold the plaintiffs both hostage on falsified actions while they systematically stripped them of all rights and property that legally could not be done. ( The document prepared by Attorney David Fulmer emphasized this matter succinctly) These actions are nothing more than a debtor devising away to avoid all responsibility while retalliating against the creditor and making his retalliation and fraud pay with an extortive and embezzling as well a criminal swindle to enrich himself and anyone who aided him sharing the spoils in a plot where each participate worked a part of an unlawful drama of fraud trick and deceit to deprive the plaintiffs Josephine Carroll who is medically ill of her food, clothes, home and all her effects to essentially murder her and deprive both the plaintiffs all of their rights and property again prohibited by the Permanent Injunction.

11. The law requires malicious prosecution and abuse of process to be litigated when it ceases. In this case it has not ceased because attorneys as added players have exploited a domestic issue with their contacts to add to this already difficult and criminal and tortious course, working the crime spree to their advantage and through devises and contacts. One can not find justice where one has literally been held hostage, deprived of all standing and rights by a group in control and then expect to maintain justice, equity and secure ones rights and property when those entrusted to protect you refuse to enforce the law because they and their associates stand to benefit from a betrayal and your losses.

12. Aiding and abeitting crimes and maintaining the deprivation of constitutional rights is a major part of the claims in this case and the documents and facts are self evident. One can not claim to be a creditor when they are a debtor or claim to have a judgement that in fact was voided and prohibited by law and thereby enforce the fraud to make a winfall stripping entitlements to defeat divorce awards, legal obligations and obtain any asset regardless of source for an instant profit.

13. One can not claim to enforce a judgement without proper proceedings and take assets without an accounting and by force and make a judgement into a six fold gain, through crimes and injuries against the intended victims. When laypeople and counselors alike believe the entire story is outrageous and they agree that proof exists that this case is nothing but a sham to steal and injure and attempt murder and any available injury possible to benefit obstruction to justice, then the court should realize that many facts remain to be examined and addressed. Evidence has been compiled where several cases have been found to involve the same players injuring other parties in the same or similar fashion on fraud and networking of the system to enrich themselves.

14. The end result should be seen as common theft or what should be seen as grand larceny of major assets on false documents. All of the activities to make the gains realized should be seen as racqueteering when there are many players in the conspiracy and this is obviously pattern and practice with several instances of major criminal acts. These beliefs have been confirmed by several ethical and well known attorneys. Ultimately many of the defendants have benefitted on false actions worked to benefit themselves. The facts are documented and witnessed by many.

15. The U.S. District Court indicated that documents were not submitted to substantiate the claims. The plaintiffs James J. Carroll, III and Josephine Carroll attempted to do so upon filing the case with a brief excerpt of the most pertinent documents. The clerk believing that the honorable justice O'Toole would realize that abolishment of all awards of a divorce decree post divorce and theft of Federally and state protected alimony as well as commingling of assets of adult children on issues of total fraud was not legal or possible and his honor in his wisdom would understand that something was very wrong. The clerk was cognizant that Federal Law should uphold a decree of divorce and it stood to be enforced as well as the Injunction which was not taken by the clerk. The plaintiffs will present the needed documentation to the court once again and much more fact intensive analysis may be necessary to demonstrate the truth.

16. The defendant intentionally acted through his animosity towards Josephine Carroll and James J. Carroll, III continued to misuse the courts something that was already precluded by Permanent Injunction and therefore regardless of claims, thereafter all that followed this order and the divorce decree are legally void by law. Attorneys in the Department of Justice and the U.S. Attorney as well as the District Attorney affirmed this fact.

The foundation of all of the claims of the defendant James J. Carroll, Jr. were based on a falsified docket, a fabricated judgement and staged controversies again relitigating matters that could only be relitigated by law through Probate Court.

17. All of the foregoing actions were precluded by law. Since Josephine Carroll was denied all income and Federally secured payments for basic alimony were also stripped from Josephine Carroll on fabricated orders created by the defendant James J. Carroll, Jr. with clerks in the court, Federal Law and Federal Constitutional Protections were nullified and the Administrators of the basic alimony payments from Office of Personnel Management thereby stopped all payments based on the misbelief that they too could overstep Federal law on a false document which they reasonably knew contradicted a divorce decree on file, a dictating document by law. Within this dictating document was a Qualified Domestic Relations Order upheld by Superior Court in Civil Action 95-6545, which OPM had accepted before the fabricated order by James J. Carroll, Jr. OPM was given proof of a certified divorce decree, a certified injunction and a certified order with documents proving the alleged order of James J. Carroll, Jr. was fraud. OPM instead of admitting an error, remained steadfast overstepping both Federal and State Law that has already decided such issues. These actions should have been seen by OPM as being void when both state and Federal prohibited any such action. OPM has refused to give records and investigation has uncovered that although Court Ordered Benefits Branch claims no divorce decree or order on which to apportion exist for Josephine Carroll, other departments confirm the decree document and order is on record.

18. OPM has refused to correct this issue passing off the responsibility for their actions on the courts and Josephine Carroll. If an individual calls the fire department due to a small fire that can be easily extinquished and they refuse to respond, while the house burns down, the question is then raised as to who is responsible. Clearly the responsibility lies with the malfeasance in neglecting duties.

19. Due actions of both the defendant James J. Carroll, Jr. and OPM, many thousands of dollars of U.S. Treasury funds remain unaccounted for, have been stolen and remain unpaid.

20. The defendant James J. Carroll, Jr. the pawn or catalyst of all controversies aided by attorney Gahan, attorney Costantino and the Town of Arlington, has a history of fraud against Postal Officials, the I.R.S., Insurers and the Massachusetts Courts. This defendant has committed many abuses against the public as well as possesses criminal record.

Since the defendant James J. Carroll is legally responsible to Josephine Carroll for all debts and alimony which amounts to well over $1 million dollars alone, the plaintiff Josephine Carroll makes a request upon the U.S. District Court to enforce the recovery of this debt and to make the defendant pay the full cost of the filing fees and other needed costs. Due to the imposed injuries and deprivation of funds coupled with a theft of all assets, the plaintiffs were forced to file as forma pauperus and since the defendant has ample means and is the basis of all controversies where there is no debate that controversies were caused for defeating obligations and malice as well as unjust enrichment, the court should require the full payment from this defendant.

### Plaintiffs' Section 1985 Claims and Assertions

The U.S. District Court has raised the issues of several United States Codes referenced in the initial brief. The plaintiffs Josephine Carroll and James J. Carroll, III jointly and severally referenced what they believed to be applicable code in their briefs. A request was made to alter or amend issues before the court as necessary. 42 U.S.C. s 1983 is one of the applicable codes and as the court indicated are predicated upon proving Section 1985.

As the court properly noted Section (1) 1985 does not apply to this case. Section (3) may be

applied if violations of the Violence Against Women Act (VAWA) can be sustained as a issue of protected class of persons for the plaintiff Josephine Carroll. Section 1985 (2) may be one of the most pertinent issues of this case because after review by U.S. Attorneys in New Hampshire their conclusions were that the case was quote a fabulous case riddled with abuse of power and many facts show conspiracy and this was an evaluation from seasoned trained professionals involved in Federal Practice. There is clear and convincing evidence that the defendants in one form or another acted, negligently, maliciously, wanton or wrecklessly, aided abeitted or devised and maintained a criminal plot to act in conspiracy with one another and the defendant James J. Carroll, Jr. to work a fabricated scenario to the benefit of all involved. Police abuse claims can involve 42 U.S.C. 14141 and many other federal codes such as the landmark case, *Monell v. Dept. of Social Services of the City of New York,* which assigned liability to local governments for constitutional violations by their employees.

Clearly by the facts which are demonstrated by the conduct and orders as well as the end result, there is much merit to this case and the facts are self evident. The court should understand that the plaintiffs can not present all facts and documents and easily show the court 17 years of regular abuses in one brief.

The court has questioned how the facts amount to conspiracy. Arrangements were made with select individuals who were a part of an orchestrated plot worked through the obsessive behavior and questionable documented irrationality of the defendant James J. Carroll, Jr. which was known and capitalized upon for unjust enrichment at the expense of the plaintiffs.

The individuals with legal, political and judicial affilliations used their resources to operate a conspiracy on misuse of the process, fabricated claims and fabricated documents on a criminal course which continued despite restraint and prohibition and intervention with sanctions by the courts. The networking continued to allow an unlawful agenda to progress. This agenda was clearly noted by Justice Zobel and his orders as well as that of Justice Quinlan and prior awards prohibited the conduct that ensued.

Since no legal foundation existed, the matters made to appear as legal matters progressed to cover continued assaults and crimes, where remedies were obstructed and crimes and denial of rights maintained passing the abuses off as civil matters while using the higher standard of alleging that the plaintiffs committed crimes and thereby falsely prosecuted them on fabricated events and false police reports using the system against them just as all civil matters were used to deprive them of their rights and property. These ongoing assaults involve many outrageous acts where innocent parties have thereby been entangling who were not subject to suit, levy or a divorce, but also suffered damages from the assaults directed at the plaintiffs. These actions have interfered with a contractual relationship and where the plaintiffs were legally liable to protect the interests of those parties in their relationships with one another which no court could overstep by law in the actions that were orchestrated.

The court has raised issues of claims that could be raised in state appellate courts and would have been if the process was allowed to work as it was intended;

The plaintiffs have attempted to appeal cases for proper review receiving nonsensical obstructions in both the lower levels needed to access for filing and creation of the appeals and in the appeals court itself. If the plaintiffs had not experienced all of the abuses and obstructions they have endured themselves, they would equally be skeptical that this much collusion and obstruction could be at work, but the preponderence of the evidence is prima facie evidence.

Various excuses would be made such as the clerk that handles the appeals was out sick, no one else knew how to file, blatant refusals to file or claims that papers and files were not available and if an appeal was able to be filed, sabotage and hostility followed after clerks in the lower level would refuse to provide signed orders needed for appeal, matters placed on appeal none the less were stalled and delayed with many requested changes and delays preventing speedy trial and then the appeal was dismissed claiming that a successive order entered in the lower case on which it derived when the initial order was not signed, the successive alleged order could not occur when that case was on appeal and appeals are to be decided first before the case on which it was appealled could proceed.

Upon requesting to appeal to the full court finding the decision erroneous, the clerk snapped with hostility stating the case was fast tracked for disposal and you don't have any right to appeal. Clearly this is a denial of due process when the next step is an appeal to the full court for review.

The group involved networking the system knowing that the plaintiff Josephine Carroll was vulnerable as a divorced woman who was being deprived of proper alimony was thereby targeted and denied her rights through police, through Town Officials who aided the defendant in Domestic Abuse, through crimes intentionally acted upon against the plaintiffs and cover up as well as obstruction of Justice then used the District Attorney and various individuals to work false documents and staged events to fool those courts that have integrity and actually enforce the law. Upon complaint to the State Supreme Court, staff attorneys agreed that none of what occurred was legitimate and the events were criminal and nonsensical. Request was made to return to Probate Court where the First Justice was disturbed by the facts of the case and requested a Contempt to be filed. Because of the major hardships intentionally placed in the path of the plaintiffs this has been difficult to accomplish with any expedience. The court should note that the lives and accomplishments of the plaintiffs have been wiped out and obliterated by a group of criminals hiding behind the law.

Complaints to the Attorney General and the District Attorney have been obstructed or ignored where issues of public integrity and crime admitted as such by staff of the Attorney General and D.A. was then posed as a civil matter, a private issue or a matter for the courts. Evidence exists of other like cases being ignored as well where shams on false papers to steal entire estates, particularly real estate and entire contents of homes are being ignored by law enforcement and the courts with the same individuals being involved in major scandals. Federal Bureau of Investigation agents have claimed that they are receiving 30 like complaints daily and other sources claim like cases have been presented to the F.B.I. nationally.

The actions presented in this brief which are backed by court records and witnesses and other records are available for the court, but it is not the intention of the plaintiffs to burden the courts with an

extensive record of fraud. To show that substance exists some records will be provided with this brief.

The court should question why a woman married 40 years, 13 years after a divorce is stripped of all alimony, is denied any relief or protection, is placed under continual attack when an exspouse owes over $1million dollars of arrears of alimony debt to her and then as a woman who was living an upper class life style with ample assets and a son who had many of his own assets then both end up with only the clothes on their backs amidst all of the other serious activities mentioned. The court should question where all these assets which were previously seen by an insurer have been disposed of from a 9 room home with a large tool shed and a basement and a garage full of items. The court should ask why the Attorney General and the Arlington Police will not make police reports for credit card fraud, theft of assets including a stolen car which a neighbor can verify was stolen and Arlington Police confirm can only be towed with a claim check which they claimed to lack as a requirement. The court should then understand with all of these issues in the brief where all their rights have been obstructed and stripped from them, the plaintiffs that in a town noted for scandal and corruption, that some serious crime and torts are being covered up at the expense of not only the plaintiffs but at the expense of the public and the United States Government. Consultation with the media has made them comment that they believe the plaintiffs have only hit the tip of the iceberg and there will be many more credulous facts to show the court that there is an appearance of organized crime interwound with serious scandals in this case. The media noting these facts and some public officials are now questioning with all this wrong why the authorities have remained silent. Silence is assent under the law and most certainly can be a 42 U.S.C. s 1983 issue.

Josephine M. Carroll, Pro se.    5/12/16

James J. Carroll, III                 **UNITED STATES DISTRICT COURT**

Josephine M. Carroll                  **DISTRICT OF MASSACHUSETTS**
P.O. Box 863                          2006 MAY 12  A 11: 55
Windham, N.H. 03087

                                      U.S. DISTRICT COURT
JAMES J. CARROLL, III          )      DISTRICT OF MASS C.A. 05-11670-GAO
JOSEPHINE M. CARROLL, et als.)
Plaintiff (s),                 )
                               )
vs.                            )
                               )
JAMES J. CARROLL, JR., et als. )
Defendant (s),                 )
                               )      CLARIFICATION
                                         OF
                                      ACTION

### ANSWER TO MEMORANDUM AND ORDER

Per Memorandum and Order, dated April 6, 2006, of the honorable U.S. District Justice George

A. O'Toole in the encaptioned case an answer to issues raised by the court is to be made within

[35] thirty five days of said order. The plaintiffs for judicial economy in a complex case hereby

answer timely within specified parameters. The plaintiffs Josephine Carroll and James J. Carroll,

III answer jointly and severally in a single brief to make the facts and responses clearer and more

coherent. Two of the same brief will be supplied to the court for each named plaintiff.

The claims of the plaintiffs are interwound through their inter-relationships inter alia with one

another. Therefore, the court is asked to accept a single brief on this answer for judicial

economy.

The Court has requested 15 double spaced pages for responses. Due to the complexity, scope and

the history behind the case, and the need to show the court good cause and rational reasoning,

the court is asked to allow the recitation of the events for clarity which exceeds the 15 pages

because it appears that the court has some of the material facts incorrect and the original brief

was not comprehensive where some material aspects were vague leading to misunderstanding.

1-96
Plus 13 pgs
For ANSWER

The plaintiffs request a restatement to allow clarity with the answers to the points raised to the court within the 15 page limit thereafter as a supplement. No material changes are being made nor are any defendants being added without permission of the court.

Background

1. The instant case arises out of a divorce gone amuck with a compilation of premeditated orchestrated issues of fraud, crimes, torts and related issues under law with ongoing coverup and obstruction[s] as well as criminal batteries, intimidation and coersion to maintain the status quo. Through a long convoluted course of events, the plaintiffs have been systematically dismantled of all their rights, protections and property comprising the stripping away of a life of work, sacrifice, gifts, heirlooms and memories. The activities have literally made the plaintiffs jointly and severally homeless and assetless. The story is outrageous, heinous and involves extroardinary loss and hardship[s] which reach far beyond monetary issues of damages. The acts of the defendants in totality violate Federal law and are un American.

If the claims are to survive in the U.S. District Court, an amount of damages will be filed to meet requirements of the court. The court needs a clear understanding of the facts before that should occur.

2. Josephine Carroll the plaintiff was married [40] fourty years to the defendant James J. Carroll, Jr., a practicing Optometrist since 1950. The defendant James J. Carroll, Jr. worked concurrently with the United States Postal Service for 45 years until his retirement at time of divorce from Josephine Carroll in 1989, following a 40 year marriage ending by an entry of decree nisi by Bowser, J. in the Middlesex Probate and Family Court Cambridge, Massachusetts on August 5, 1989 as docket number 86 D 1651.

3. Although the defendant James J. Carroll, Jr. filed for divorce with no apparent reasoning, he refused to meet any obligation required by a divorce and the law, acting as if he remained married for what suited him when he chose, but concurrently chose any opportunity to evade all responsibility to his longtime wife and family who was predominately responsible for the accumulation of assets and the work that maintained all of it. The plaintiff Josephine Carroll was the successful woman behind the successful man who sought every opportunity to further the ambitions of her spouse as well as making many sacrifices to allow the defendant to become a professional man. Her sacrifices allowed the family to attain a comfortable lifestyle. The plaintiff Josephine Carroll worked to place the defendant James J. Carroll, Jr. through college and bought his equipment which was costly as well as worked in his business for 15 years as a clinitian. Josephine Carroll became an Officer in the Bedford Woman's Club building standing in the community and aiding the defendant James J. Carroll, Jr. to build a good reputation and successful business in the community to further both the business and the family.

4. The plaintiff Josephine Carroll raised three children from 1956 until around 1988 when the youngest child Richard attained age of majority at 18 years of age.

Until this divorce action, the family worked together as a unit. ( Please see divorce decree findings of fact submitted with initial filing.) As facts can be shown there are gross misrepresentations of many material facts to hide, secrete and steal assets as well as materially shift assets in favor of the defendant James J. Carroll, Jr. Due to fraud arising in the divorce which has never been adequately abated, and because of the continued conduct that followed, some of the issues of fraud have never been corrected and some of the fraud was addressed by intervention of Chief Justice Podulski.

5. Succinctly stated, Josephine Carroll made the greatest of contributions to the marriage.

The court is asked to note that the events leading into this court are predominantly due to James

J. Carroll, Jr. but could not have been made possible without the aid, the abeitting, the complicity

and the design and maintainence of many co-conspirators, orchestration and the refusal for the

state and local municiple systems including the Massachusetts Courts to make the defendant and

all who aided him accountable, thereby refusing to enforce rights and the law as it was intended

and to the contrary enforcing the law for the criminal element. The underlying history involves

[17] seventeen years of conflicts which are due to actions of the defendant James J. Carroll, Jr.

Through the obsessive disgruntled behavior, of the defendant James J. Carroll, Jr., he

has enlisted  a long list of opportunists that were equally restrained with him by the Superior

Court through Permanent [Emphasis] Injunctive Order of the honorable Hilliar Zobel in civil

action 95 - 6545. (Some of those who previously attempted to help this defendant were later

found to be disbarred and jailed in unrelated activities.)

6. The Permanent Injunctive Order dated July 2, 1997, specified enjoinment of the defendant

James J. Carroll, Jr. his counselors mainly Robert A. Costantino (defendant) and David Rubin, as

well as agents and third persons which is  defined as anyone who assist in violation of that Order.

A. The Order mandated and continues to require the maintainence of the status quo which

equates to upholding entitlements under a divorce decree and maintaining property titles, as they

existed, as well as the prevention of any tampering of respective estates of the parties, as they

existed which preceeded any conversion, theft of real estate, auto thefts, credit card fraud,

mortgage fraud, identity fraud, secretion, embezzlement and or destruction or concealment of

sizeable personal assets in essentially a swindle scheme which are elements which caused the

filing of this complaint before this court.

4

B. The Injunctive Order in Superior Court case 95-6545, by Zobel, J. enjoined the foregoing individuals from having any contact of any type directly or indirectly with the plaintiffs Josephine M. Carroll and James J. Carroll, III as well as those associated with them.

C. The Injunctive Order prohibited any interference with liberties*, or property rights* and prohibited theft or vandalism of property*. His honor Hilliar Zobel was a former Law Professor and a divorce attorney understanding the complexities and the rulings that prohibited the conduct of the defendants who would listen to no one and would stop at nothing to attain their goals. These facts were something that justice Zobel noted questioning counsel for Josephine Carroll as to why attorney Costantino and James J. Carroll, Jr. were not prosecuted for felony activities.

D. Justice Hilliar Zobel chastized attorney Robert A. Costantino,[Emphasis]

James J. Carroll, Jr. and their accomplices quote, "guerrillas and gorrillas" [Emphasis] and made a statement to attorney Costantino retorting that he was trying awefully hard using a fabricated judgement from a county where the parties of both sides could not litigate a case by court rules and juristiction, nor relitigate matters from predivorce decree in any other court but Probate Court which never occurred.

7. The defendant James J. Carroll, Jr. post divorce claimed to secure a $561, 175.30 judgement in a Lowell District Court when the proper venue was Cambridge. The case 93RM95, a remanded case was found riddled with fraud and was used to create many frivolous and legally prohibited cases in courts where the alleged judgement could not be used, working towards the goals of James J. Carroll, Jr. which was overtaking and unjustly enriching himself and others with any asset regardless of title or source in the possession of the plaintiffs Josephine Carroll and James J. Carroll, III and thereby converting it to James J. Carroll, Jr. and any other party

5

7 cont'd

through fraud crime and duress as well as criminal battery. These conflicts are subject[s] of this

civil action in U.S. District Court because although Justice Zobel ordered all contact between the

parties to cease and desist permanently and although he emphasized that he had to sever the

relationship permanently, the defendants were not going to be stopped or take orders from

anyone and thereby ignored these orders never seeking relief from this Permanent order which

was required by law and violation was a criminal offense.

8. James J. Carroll, Jr and his counselors and cohorts continued their course as if the order

precluding their activities never existed using their fraudulent judgement which was stricken by

the entry of this Permanent Injunctive Order in Superior Court.

9. Superior Court is a higher court to a District Court and may overrule actions of the lower

court, such as what occurred with this Injunctive Order, thereby voiding any claims of James J.

Carroll, Jr. and his counsel regardless of their claims of validity or merit which again was and

can be demonstrated to be fraudulently based.

10. The defendant James J. Carroll, Jr. could not single handedly accomplish the magnitude of

the issues in the instant civil action alone and the underlying claims on his own.

The resulting problems formulate the complaint which is essentially a group who have the

contacts, resources and the abilities to cover for one another, misusing the system for personal

and opportunistic gain and denying all wrong doing and accountability purposefully making a

simple divorce matter into an outrageous grotesque, heinous and incredulous drama to not only

subvert the law for criminal purposes, but hide behind color of law and seek the immunities of

the system for protection while creating and covering for staged matters posed as law, as well as

6

maintaining connections to defy justice while making the story appear unbelievable to again evade detection and accountability. Succinctly stated noone can make false papers on the property of another and then claim they are valid when the party has never been under any legal detriment and then claim that the rights of the perpetrator of fraud are superior. That is crime.

11. Well seasoned legal scholars who have sought out the truth in this case are equally overwhelmed noting many players and questioning why the law has done nothing with such a case and thereby stating the case exceeds their abilities and or their resources. What is involved in this case should be seen as individuals in the system who have aided the defendant James J. Carroll, Jr. in what should be viewed as licensed domestic abuse and a crime wave hidden under color of law with legally void actions or nullities with many criminal abuses, many civil, constitutional and human rights issues so outrageous that the acts were designed to punish, traumatize and literally murder Josephine Carroll capitalizing on her severe heart condition and inability to overcome the obstacles intentionally placed in her path and maintained which all fall squarely on the legal responsibilities of James J. Carroll, Jr., not to mention the Town of Arlington who was to enforce the law and not subvert it to their benefit and for those connected to them. The same standard applies to the Commonwealth who is to uphold the law, uphold preexisting permanent orders and the Massachusetts Charter and or the defense and protection of the public with a court system which is to enforce the law, not make it up as they go along or subvert it for special interests and or use the courts to sell off the rights and property of constituents to the highest bidder without any valid basis or controversy.

These facts are no less than corruption and at a minimum neglect of duty and care.

There are some very serious public integrity issues interwound with domestic issues in this case. The end result has been a long list of torts with both Constitutional and Civil Rights violations

7

11 cont'd

combined in an intentionally fabricated and staged succession of cases riddled with fraud, false

documents, one sided hearing, no service, no proper process through the alleged cases with false

legally void proceedings that contradict existing law, based on fabricated events using the law for

added crimes which are no more than a compilation of legally void actions prohibited by law,

combined with conspiracy and payola as well as numerous issues of corruption, abuse of process

and malicious prosecution and terrorist tactics. Nothing in the law sanctions conspiracy and

corruption designed to victimize public citizens for private gain. It is a story of the system gone

wrong and then placing the total onus on the victims to enforce the law and uphold it.

A. The consensus after evaluation of this case by attorneys is initial disbelief until examining all

facts and investigating. Many attorneys have stated that they did not believe the story until we

quote, "opened up their eyes and sufficiently proved the facts to them and that the preponderence

of the evidence shows the actual truth." Federal Bureau of Investigation agents, both former,

current U.S. Attorneys, State Police Officers in the Office of the Massachusetts Attorney

General, members of the Office of the District Attorney for Middlesex County along with many

justices in the state court system have noted the nonsensical activities stating they knew things

were very wrong, asking why the B.B.O. failed to disbar the attorneys and many stating that they

saw that there is an ongoing coverup or quote, "This was a bought case." unquote.

12. There are issues that Massachusetts Law enforcement and the courts were supposed to address, but no one has taken ownership and the matters are passed off for an attorney or for other courts or forums such as U.S. District Court to address. The plaintiffs contend that they have essentially been placed in a situation of taxation without representation where their rights have been intentionally compromised for special interests while they are denied all standing and protection by the Commonwealth of Massachusetts where no one will enforce the laws of the state or uphold existing court orders which were final. The plaintiffs jointly and severally have supported their Government as good law abiding God fearing, tax paying American Citizens, paying taxes to receive protection and assistance and or support in time of need. The facts will show that a man who is out of control and wanted a onesided divorce, attempted to kill his wife, as well as stripped his long time wife and son and related parties which the plaintiffs were bound by law to protect taking any asset available 13 years after a divorce. The facts will show that ultimately many illegal acts occurred to unjustly enrich the defendant James J. Carroll, Jr. and a cast of equally corrupt individuals who should be seen as highly dangerous people capable of absolutely anything, all working a family issue to their benefit for their own desires and personal agendas or gain on pure nonsense and orchestrated fraud. If a U.S. Citizen can not access their rights in the state courts, the only alternatives are Federal Juristiction.

The court is asked to view a document prepared by attorney David Fulmer which tells a major part of the story. (Exhibit 1)

13. The plaintiffs jointly and severally allege that the defendant James J. Carroll, Jr. with the aid of counsel premeditated and orchestrated a criminal scheme to embezzle assets with false titles, illicitly procured mortgages such as the defendant James J. Carroll, Jr. claiming married on mortgages in 1994 through 1996 when the parties divorce in 1989. The mortgage fraud was procured through Federal Banks to fund counsel and other individuals who would aid James J. Carroll, Jr. to make his goals attainable while they acted as complicitors to criminal conduct, violated constitutional and civil rights of the plaintiffs jointly and severally which they asserted as lawful acts [ as trick or deceit] to mislead the plaintiffs Josephine M. Carroll, James J. Carroll, III and anyone else who was not aware of the extent and scope of the activities therefore enacting a swindle scheme with false documents, fabricated and staged proceedings and using criminal force depriving the plaintiffs jointly and severally of all rights secured under the laws of the United States of America.  To emphasize this point  no one is allowed to forge checks or assume the identity of another or create false currency and then use it to defraud the United States Government or any other party, because on the face it may appear authentic, but in reality is a fraud and a crime.

14. The end result of the actions in this case has been theft by Trick or Theft by Deceit, a state crime with a  long list of  losses, hardships, legal complications and outrageous issues which have also been perpetrated against the  Federal Government. The activities are the equivalent to a Ponzi scheme, a pyramid scheme and  or racqueteering.  The alleged fabricated legal actions which allowed events to occur to open the door for more crimes alleged as color of law are the basis of the foundation on which the plaintiffs were entrapped into a deceptive succession of events to then victimize them.

15. The plaintiffs jointly and severally have obtained proof that James J. Carroll, Jr. rewarded with payola anyone who made the foregoing activities possible while the defendant cried victim and cried poor as a cover or smoke screen transferring his actions against the plaintiffs.

16. The entire case underlying the abuse[s] against the plaintiff[s] jointly and severally encompasses 17 years of non stop batterie[s], setup[s] and attack[s] where a plot was consistantly reorchestrated to meet the original agenda and that agenda was to strip the plaintiffs and any party connected to them of all assets/rights and protections while increasing expenses and hardships to make life unsustainable and ultimately murder the plaintiff Josephine Carroll, as well as financially destroy the plaintiff James J. Carroll while attempting to incarcerate him on staged events.

Succinctly stated, this is abuse of process and malicious prosecution with vexatious, frivolous and meritless litigation to overwhelm the plaintiffs. The court has raised time bar limitations and procedures which at the state level have been impossible to follow, because of the activities in this case which continue to current date, causing statutes of limitations to be ongoing. The law requires suit on malicious prosecution and abuse of process matters to be filed when that activity stops, but in reality this activity will not stop until remedies are retained by the plaintiffs and prosecution of the defendants actually occurs

17. At this juncture the court is asked to take note that noone married 40 years who has made the greater contributions to a marriage and has accumulated a comfortable lifestyle with more than sufficient assets ends up having them all taken away and given to an exspouse 13 years after a divorce, especially assets that legally were not tied to any controversy nor could be subject of any legal process. Deeds are never conveyed without anyone signing away their title, yet this was done with the aid of select members of the Massachusetts Land Court and the Town of Arlington.

//

18. Some of the facts in this case are no different from the matter where a Boston Police Officer was prosecuted by the Commonwealth of Massachusetts for stealing a Mercedes Benz automobile and having a fellow Boston Police Officer through the Boston Police Auction create a false title for covering the theft and making the appearance of valid ownership. The difference in the instant case, although like facts exist, is that issues are more reprehensible, more complex and on a greater scale.

19. To clarify facts to the court, no tax seizure or other lawful seizure was involved which comprises any part of the issues formulating a legal issue before this court as mistakenly believed by this court. [Emphasis ]

A. The court should question how an exspouse [13] thirteen years after a divorce could end up with the title and all contents of a home of his exwife and residence of his adult son taking his assets as well including an automobile when the home and all contents were awarded to Josephine Carroll in a divorce decree and no changes to that decree ever occurred. [Emphasis] The court should note that title of the realties in both Bedford and Arlington Massachusetts were always in the lawful control of Josephine Carroll.

B. The court should also question how a disgruntled exspouse in "contempt of court" on several orders in Probate and Superior Courts who owed over [$1,000,000.00] $1 million dollars of non extinquishable alimony debt could collect on a voided fabricated judgement, voided by a Superior Court Permanent Injunction to stop all contact and interference and what was noted as crimes and misuse of the system.

C. The court should also question how anyone can obtain a judgement on a dismissed case especially when the main defendants were dismissed without fault in a case with no service required by law.

D. The court should ask how an alleged judgement amount increases post award changing an alleged amount of damages by default from $561, 175.30 to $761, 175.30. The court should then ask why from this amount papers claiming similar amounts to uphold an attempt to substantiate the amount claiming interest accrual with no show cause hearings and no accounting to use to substantiate stealing real estate. The court should ask why from this amount an extorted amount of over $ 1 million dollars was received from the Office of the Middlesex Sheriff as well as demands for $10,000.00. Then the court should note that after complaint to Administrative Offices of District Court Chief Justice of District Court Lynda Connolly called the amount wrong and a mark yet the increased amount is used to levy on assets never subject of suit creating a winfall of at least six fold over an alleged $561,175.30 judgement with no appraisals, no show cause hearings and no accounting of assets when in fact the defendant James J. Carroll, Jr. and the defendant Robert A. Costantino were restrained from this conduct Permanently [Emphasis] and the divorce decree never changed [Emphasis] as well as by law prohibited the interfere with the estate of the other once divorced. M.G.L. ch. 208. [Emphasis]

E. The court should question how titles could be conveyed without the legal parties signing rights and title to anyone, thereby raising questions as to how the defendant James J. Carroll, Jr. could lawfully sell the home of his former wife thirteen years post divorce and how a Belmont Zoning Attorney and an Arlington Town Manager could claim ownership on false titles aided by select justices of the courts who have affilliations with these same parties aiding them to claim title to stolen property, prohibited by law any way one views the situation.

F. The court should ask how a valid title could be changed when the true owners were not subject of any suit or levy and therefore regardless of any claim of judicial proceedings is an automatic nullity by law.

13.

19G. The court should question how a woman married 40 years at age 73 would be forced to the streets with nothing but the clothes on her back, while her food is thrown into the street in the heat of the August sun to perish which immediately spoiled, why without notice or legal basis she is made to undergo abuse, humiliation and deprived of all rights while neighbors watch stunned by the events and to add to the injury an exspouse is videotaping the assault for his sadistic pleasure in the company of 4 deputy sheriffs on one occassion and many police officers on another.

H. The court should ponder why four deputy sheriffs of the Middlesex County Sheriffs Office held their hands on their guns, after appearing without proper notice or hearing and why would these law officers threatened arrest and deadly force after forcibly breaking and entering a private residence. [This is prohibited conduct by law and not allowed under any eviction] With no legal basis this is a crime of break and entry in the daytime.

The court should ask why the plaintiffs were forcibly removed from their home which is excessive force, or why they were assaulted and battered having arms twisted. This is excessive force and  a crime of committing an assault and battery on an elder, a felony as well as a kidnapping and armed robbery when property is taken from a home.  No lawful eviction could be applied between divorced parties but was a guise to make an appearance that legal legitimacy was in place. There are many other legal reasons that make this fraud and crime. These issues are clearly prohibited under both Federal and State law.

I. The court should note that these events occurred through deputy sheriff Donnelly already caught in fraud abuse and assault and battery in concert with fraud and payola from the defendant as was proven after close of the divorce proceedings and has been found once again. This is conspiracy and a relationship prohibited under both Federal and State Law. The deputy sheriff by statute has no arresting powers on restraining order arrests which was an issue presented before these events.

A. M.G.L. chapter 239 section 4 does not allow any of these actions under lawful evictions which again is a nullity with divorced spouses.

19 J. The court should question how an exspouse can take

title to a vehicle of his son in an eviction, not allowed by law.

K. The court should question how what equates to licensed domestic abuse could be called law at all. The court should ponder why $10,000.00 of credit card fraud followed against the discover card on checks taken from the home found forged in an alleged eviction which would be the responsibility of the Office of the Middlesex Sheriff a state agency that caused the event to occur.[Emphasis]

L. The court should ask how this could happen in an eviction when the responsibility lies squarely with the Office of the Middlesex Sheriff, a state agency.

This is an office highlighted in the Lowell Sun Newspaper for corruption. This is a department highlighted by the Globe Spot light team for shakedowns of officers by superiors. [Emphasis] By Massachusetts law and laws in many states which often reference the Defense of Marriage Act, once parties are divorced the awards through decree are final awards and entitlements and with regard to those awards only extenuating circumstances such as filing a Rule 60 B action for fraud can change those decisions which must be heard in a Probate Court.[Emphasis]

/ 5.

19 L. This requirement never happened which is therefore a tort and crime forming the basis for grievances before this court. The issues involved, create the subject matter juristiction which this court can find a basis for claim on which relief can be sought as the issues are both torts and violations of Federal Law.

M. The issues when properly framed equate to crimes, torts, civil rights and constitutional issues of many types. If the court can imagine if a U.S. Citizen was under constant attack and deprived of all of their rights, there would therefore be many claims on which to debate. The issues are subject of matter on which a claim for damages is based. [Emphasis]

The facts in this case which are complex are basis for claim[s] for damages which are not limited to real estate theft and fraud, property damages, theft of chattels, theft of autos, or credit card fraud, but issues that involve numerous torts, crimes, civil rights abuses and constitutional rights violations and deprivations as well as losses which are many and will require punitive damages. theft under RICO.

N. The court should ask how titles to autos of James J. Carroll, III became the property of James J. Carroll, Jr. without any legal proceeding; hearing; due process, without legal transfer or any offer and acceptance on not one but two vehicles, one of which claimed to be awarded in an eviction which again is not legally possible. This fact when the car was titled in New Hampshire and a concurrent false title was found in the Massachusetts Registry. Although this may be a state issue, Motor vehicle fraud and motor vehicle records tampering is a Federal Offense and under Federal juristiction and a Federal Crime.

O. The court should be aware that no actual execution proceedings ever took place and evidence shows that documents claiming execution have falsified, the amounts inflated and altered and debated by Chief Justice Lynda Connelly.) [Emphasis]

19 P. The court should ask how under the circumstances as stated, that an exwife of 40 years is reduced to the streets with no alimony when alimony was Federally and state protected under 42 U.S.C. Title V 651-659 (Hobbs vs. OPM) and M.G.L. chapter 208 section 34 and how she is forced to the streets being medically ill, stripped of a home of 34 years, stripped of all contents and made to retain only the clothes on her back. The court should ask if the state of Massachusetts can say that this is maintaining a woman in the same standard of living she was accustomed to during the course of the marriage as required by Massachusetts Law.

Q. The court should ask how an adult son not connected to a divorce of his parents is placed in the same circumstances being made homeless and assetless, as well as placed under constant attack through the state court system to destroy and undermine his reputation, financially injure him, falsely imprison him, deprive him of his liberties and freedoms, physically injure him, harass and intimidate him as well as remove him from any aid to his elderly mother who is medically ill.

R. The court is asked to question if it finds this scenario reasonable ; A woman who served a family for predominantly her entire life who lived in her home purchased and acquired and maintained by her efforts, living in it for 34 years only to be taken by surprise on fraud, where she is beaten and traumatized and stripped of everything she held dear at 73, only to be forced literally onto the streets, on welfare, with meanial social security in part due to her exspouse amounting to basically no income and no assets to survive and in the process of a scheme stripped of a garnished federal pension (Free of all legal process) awarded for basic alimony taken on fraud while an exspouse makes a windfall and many others gain from their aid to the defendant James J. Carroll, Jr. while an innocent person and her family suffer from this intentional calamity made into a literal disaster. Any attempt to recover and report this grotesque activity or attempt to seek any remedy, reporting or relief is blocked and ignored.

/7.

19 S. The court should question how these things could occur with the orders, awards, and facts that strongly conflict with the results and could not occur by law which show something is very wrong. The court should question why no level of law enforcement and no court in Massachusetts has upheld the letter of the law or orders and awards already final and in force. No court is allowed to create expost facto laws or decisions or to relegislate from the bench. T. The court should question why the plaintiffs have been denied the ability to make any police report in the town of Arlington, contest any case in the state courts and why innocent bystanders in court asked what they witnessed, thereby asking why judges would not accept evidence or testimony whereby witnesses questioned if they witnessed a kangaroo court. The court should question why no level of law enforcement has addressed what are clearly crimes. Also questions should be raised as to why all collectively have failed to report elder abuse as required by ABA rules or failed to enforce any law except in favor of their alliances and associations.

If false actions with no basis in law are acted upon and enforced, and all evidence, testimony and right to redress at any level is withheld then essentially one is a prisoner of the system with no rights although those rights are said to be "guaranteed". Under such circumstances, justices acted outside the scope of their authority and secured desired alleged judgements to aid relationships which can be shown to help many individuals violate our rights on the fabrications and fraud of the defendant James J. Carroll, Jr. his counselors and agents who were all permanently restrained by orders of Superior Court. This fact can be shown with evidence and witnesses as well as the law, but no issue has been raised naming or enjoining any justice to this suit, although there is evidence that select justices have operated outside the scope of their authority to aid in the literal disaster which has created the issues before this court.

19 U. The issue of judicial immunity has been raised by this court ;

Immunity only applies to justices acting within the scope of their lawful authority.

Although the court states this is a well settled issue, it is not being entertained as an integral part

of this case, nor has any justice been named in this case. The immunity issue has been a matter

of debate in many cases such as Barbara Johnson v The Board of Bar of Overseers.

These abuses of power opened the door for crimes and civil rights against the plaintiffs,

depriving them both of human rights ; constitutional rights violations and creating opportunities

and aid in crimes with fraud against the U.S. Government as well as the plaintiffs.

Aiding the commission of crimes and fraud is clearly prohibited by law and can not be upheld by

law as justices are not above the law. No justice can rewrite the law or overstep legislative

intent. Any justice overstepping law, is creating an automatic nullity and a void order by

operation of law. When an act is prohibited by law, no matter how acts are devised to commit a

crime, if the acts are prohibited by the law the end result is a crime with no basis in law the

matters used as a basis are no more than fraud, torts and or crimes when prohibited by statute.

Such conduct is not discretion, but abuse of discretion, abuse of power and certainly not a divine

right.

Many civil rights scholars have agreed that if a member of the judiciary as a representative of the

Commonwealth of Massachusetts aids any attorney to commit a crime, the liability passes to the

state. Under Massachusetts Law, no one can be the proximate cause of a grievance and then fault

another for their malfeasance, nor devise a suit that has the sole intent to defraud another; to bear

false witness; to commit perjury or fraud upon a court and or enlist any law enforcement officer,

court officer or judicial official to aid in the breaking of the law or the peace. That fact especially

if they receive a gratuity or exchange for their assistance.

The defendant James J. Carroll, Jr. is exactly that, the proximate cause.

19.

This conduct which has been a part of this case is clearly prohibited by law, by canons of ethics, and a judicial conduct commission.

The facts in this case are not focused on immunity but instead fraud, crimes, deprivations of all rights and protections and abuse of power at all state, court and local levels. These facts that apply in civil rights, constitutional rights and human rights abuse cases in a Federal Court, as all law derives from the United States Constitution and the Bill of Rights as well as Congress. Ancient basis for the foundations of law in the United States was based upon chancellorary courts of London England and before that the Great Roman Ruler Justinian where the word "justice" is a derivative. Congress never intended to give judicial immunity to make justices above the law, but again no justice is named in this action at this juncture.

20. The plaintiffs jointly ask the court to note that it is unlawful for either party to a divorce to interfere with the estate of the other once divorced as they are legal strangers and the matrimonial contractual relationship is finalized. [Emphasis]

Therefore, technically speaking the actions which the defendant and his counselors orchestrated who were not divorce attorneys were all prohibited by law, which again were emphasized by a Permanent Injunction. Department of Justice attorneys have confirmed this statement stating all was to end with a divorce decree and the Injunction sealed any controversy.

21. The Federal Court can impose Injunctions which are identical to those imposed in state courts, and where the Federal Court deems proper can also uphold state court injunctions in a Federal Court using the the Grand Marshall or the Office of the U.S. Marshall for enforcement.

20.

22. There are many factors in this case which will show the illicit conduct but are convoluted and complex to hide the true activities. Although the court questions the validity of the claims, there are documents, records, witnesses including attorneys and court orders that demonstrate that anything and everything has been done to overwhelm and attack the plaintiffs and steal any available asset through fabricated and frivolous controversies upheld, aided abeitted and enforced by those betraying the public trust. There are many issues in this case which make the appearance of organized crime as an integral thread and this too has been a conclusion of attorneys reviewing the facts.

23. Succinctly, stated the conduct which is involved in this case is equivalent to a looting frenzy while the law acquiesed basing actions and activities on assumptions from a scam operated by attorneys and public officials in the Town of Arlington who ignored crimes, police abuses and conduct of an exspouse who they assisted helping to seal the fate of the plaintiffs while each participated in a the shell game.

The acquiesence was due to the fact that each exchanged relationships, alliances and benefits to each other which benefitted one another which the facts clearly show.

Both plaintiffs as well as neighbors and disinterested persons being an eyewitnesses and or victims of the activities can affirm that this is most certainly fact. Some facts such as payola have been discovered or what may appear as such coupled with the many of the activities explained as criminal assaults.

24. Silence under the law is assent. No American Citizen should be subjected to setups, robbery, assault, abuse or any criminal conduct and endure the destruction of a life of work by individuals who have betrayed the public trust for their own selfish greed aiding a disgruntled spouse who has questionable rationale.

25. Conspiracies are often difficult for even law enforcement to prove, but enough facts have been compiled to show a convincing picture showing the ends do not justify the means with many inconsistancies and violations of law.

26. The plaintiff James J. Carroll, III is an adult son of James J. Carroll, Jr. and Josephine M. Carroll. He is one of three children from the marriage. Richard Blair Carroll and Joanne Carroll (Deyoung through marriage) are the other children also adults.

While James J. Carroll, III has done everything to keep his mother alive through great strife at the expense of his life and accomplishments, the other two children have demonstrated allignment with the defendant James J. Carroll, Jr. who has rewarded them for their cooperation with his agenda. The defendant James J. Carroll, Jr. has no concern for the welfare of anyone except himself, bribing and reward ing those who will follow his wishes. To emphasize this fact the defendant encouraged his son Richard to torch an unsaleable car which should have been salvage for a mere $500.00. The defendant Richard Carroll was not only caught in fraud by the Insurer but nearly lost his life in a Massachusetts General Hospital Burn Treatment center which the defendant James J. Carroll, Jr. had kept hidden from Josephine Carroll.

 The facts show that the other siblings aided James J. Carroll, Jr to benefit from the conduct and that they too were enjoined through the permanent injunction, but also aided the looting of the home of Josephine M. Carroll and James J. Carroll, III.

The plaintiff James J. Carroll swears under oath that his father James J. Carroll, Jr. who he knew as an entirely different person attempted to bribe him to join his side at the time of filing divorce. The plaintiff James J. Carroll, III asked his father to do the right thing by his mother and advising his father that he wanted no part of the issues. The facts in this case are self evident and tell the greatest story beyond any claim from either plaintiffs or defendants.

## PROCEDURAL HISTORY

I. James J. Carroll, Jr. filed for divorce on or about February 28, 1988.

II. Pre divorce filing, James J. Carroll, Jr. invited Josephine Carroll out to dinner. James J. Carroll, Jr. handed Josephine Carroll a list of ultimatums and demanded all assets be delivered to him to be placed into his sole ownership claiming he would give in return a trivial amount to Josephine Carroll in the amount of $50.00 weekly in which to live. He maintained this behavior before the courts where Justice Jackson in Cambridge Third District Court thought the amount unreasonable and created a support order.

III. Throughout the divorce proceedings, the defendant James J. Carroll, Jr. maintained that everything was solely his creating false allegations and diversions and defying orders of the courts.

IV. Due to the fact that the defendant James J. Carroll was breaking into the home of Josephine Carroll post separation and removing property, justice Sheila McGovern entered a civil order for the defendant to stay away from the marital home and not to remove property. Due to constant abuse of the defendant James J. Carroll, Jr., Cambridge District Court entered a criminal 209 A restraining Order.

V. On or about February 1988, the defendant violated both orders and removed property from the residence of Josephine Carroll while leaving threatening letters to quote "beat up the son of a bitch." Justice Leahy of Probate Court noting that the handwriting matched that of James J. Carroll, Jr. called him a liar and a drunk stating, he recognized the behavior. Justice Leahy reissued a new criminal restraining order.

23.

VI. Dog waste collected by the defendant James J. Carroll, Jr. was placed in a large cardboard box and was delivered to the home of Josephine Carroll. This was one of many bizarre acts of the defendant and was from the guard dog he purchased to injure anyone seeking to retrieve the stolen property. Josephine Carroll held title to the premises where James J. Carroll, Jr. made his residency in Bedford, but without any legal right, the defendant moved into the property and changed the locks. Arlington Police Officers alleged that they were threatened with this guard dog when trying to retrieve the stolen property.

VII. These issues with proof of forced entry through a garage window at the home of Josephine Carroll at 7 Oldham Road Arlington were shown to Arlington Police on or about February 1988.

VIII. Proof of ownership of the stolen property was given to the police with receipts, cancelled checks from James J. Carroll, III and a store letter from a store manager, including matching serial numbers. Arlington Police filed charges for receiving stolen property.

IX. The stolen property [Emphasis] was found in the possession of James J. Carroll, Jr. at 120 Great Road Bedford Massachusetts whereby a lawn mower and snow blower as part of the items taken from the residence of Josephine Carroll were found chained to a hot radiator pipe filled with oil and gas with the same stored in cans near the radiator as well as boxes with papers mountains high were found throughout realty.

X. Bedford Police fearing for the safety of James J. Carroll, Jr. and the property promptly notified Bedford Fire Department who ordered cleanup and notified Josephine Carroll that if James J. Carroll, Jr. did not comply Josephine Carroll would be assessed after the home was boarded up. Bedford Police concerned about the bizarre behavior of James J. Carroll, Jr. contacted Eliot Mental Health who allegedly interviewed James J. Carroll, Jr.

XI. The defendant James J. Carroll, Jr. blamed his wife and son James who would not jeopardize the ability for Josephine Carroll to receive alimony on which she needed to survive. The defendant James J. Carroll, Jr. objected to the interview and later filed suit post divorce reincorporating divorce issues fabrications and fraud on pre-adjudicated issues in Lowell Superior Court case 90-6857 filed on October 20, 1990.

XII. The final decision in that case was that the main defendants were ultimately dismissed without fault. The defendant attempted this strategy filing the case on October 20, 1990 after actions against him concluded to thereby attempt to reverse decisions including a divorce award dated August 25, 1989 which were all past appeals and statutes of limitations. During the break in of February 1988 which was basis and subject of the civil suit aforementioned, the defendant removed a manufacturer's title to a new car of the plaintiff James J. Carroll, III from the home of Josephine Carroll and attempted to use the confusion of names to commit identity fraud and auto title fraud as well as auto theft recording a false auto title in 1994 in the Massachusetts Registry of Motor Vehicles when Volvo of North America, Volvo of Sweden and the auto dealer had replaced the title and the car was tiled by 1990 in New Hampshire. The defendant James J. Carroll denied stealing the various items of property including this title which later surfaced contending the property found in his possession was marital. Confusion of facts was a constant theme used by the defendant and his counselors.

XIII. During the break and entry of February 1988, [*This is the issue on which all issues were based to build successive false litigation which lead to the current issues in this case. ] into the residence of Josephine Carroll at 7 Oldham Road Arlington a shot gun was stolen belonging to the plaintiff James J. Carroll, III and many other items including a GE 40 channel CB radio with silver handset, a pair of Jensen car speakers, tools and 2 Biefee motorcycle helmuts which could be shown as belonging to James J. Carroll, III. These events occurred during divorce proceedings and the defendant was stalking his former wife to know her activities. These items were seen in the possession of James J. Carroll, Jr. in his residence through a window and were most likely taken by the adult son Richard Carroll thereafter who was seen using snowmobiles. Snowmobiles require helmuts. It is most likely plausible that Richard Carroll removed these items to aid his father the defendant to evade any culpability. Richard Carroll at that time was living with James J. Carroll, Jr. and this defendant was supporting him and paying for his schooling as well as buying him new cars while both created problems for the plaintiffs.

XIV. Throughout 1989, actions progressed in Cambridge District Court whereby allegations were made by the attorneys for James J. Carroll, Jr. that defects in warrants were found. No proof or substantiation was ever given to Josephine Carroll or James J. Carroll, III. In retrospect this may have been a lie and one more trick of many played out in the course of actions that followed. Arlington Police had returned the property back to the residence of Josephine Carroll. Shortly after Arlington Police alleged that it had to be returned to the Arlington Police for evidence for the District Attorney Eric Smith.

26.

XIV cont'd.

The circumstances suddenly changed with a complete reversal of attitudes thereafter, whereby the complaints were dismissed. Violations of restraining orders were ignored by District Court and clerks stated that nothing would be heard denying due

process, equal access and equal protections under the law thereby stating to go to Probate Court, that it was a civil matter, a common excuse for avoiding prosecution of the defendant and anyone who aided him.

The goal of the plaintiffs was not to prosecute or to retalliate against the defendant James J. Carroll, Jr. , but to stop the abuses and losses and exercise their legal rights.

The attorneys for the defendant James J. Carroll, Jr. alleged that they would have the court impose a $10,000.00 per day fine for every day the [stolen] items seized were not returned to the defendant who stole them, though the true facts were never addressed. Arlington Town Counsel John Maher made a big scene, claiming he wanted no part of the case. [Emphasis]

XV. This is where the court should note that simple issues were made into a convoluted legal fiasco where individuals and attorneys connecting to members of the Town of Arlington with Town Counsel all worked a grand scheme capitalizing on the obsessions of the defendant James J. Carroll, Jr. with the vulnerability of Josephine Carroll to ultimately benefit each participant. The court should note that in the actions that followed including the Lowell Superior Court suit 90-6857, that was used as a basis by the defendant to cause all of the controversies, the Town of Arlington was not named as a defendant in that suit when the town had taken charges against James J. Carroll, Jr. and was equally involved in the events which formulated the claims of James J. Carroll, Jr. in his alleged civil suit post divorce. Apparrently a covert plot and agreement was entered into with associates and various individuals connecting to the Town of

27.

XV cont'd.

Arlington, connecting to the counselors for the defendant and the defendant James J.

Carroll, Jr. himself. Arlington and Bedford are not served by Lowell Courts, but instead served

by the Cambridge Courts. Many of the actions that followed blatantly demonstrated aid by the

Town of Arlington, their employees and their police to assist James J. Carroll, Jr. and anyone

alligned with his agenda. Harassment with various individuals connecting to the town ensued

where a bullet was shot through a car window and other vandalism as well as false arrests with

Officer David McNamee who was harassing both Josephine Carroll and James J. Carroll, III and

constantly stalking 7 Oldham Road Arlington which is a private way and private property.

XVI

On one of these occassions following the false arrest and kidnapping by Deputy Sheriff Donnelly

Officer McNamee injured James Carroll, III seizing him on Private Property at the residence

of Josephine Carroll falsely arresting him and making claims that a warrant for the arrest of

James J. Carroll, III existed. No such warrant was presented, nor had existed. The officer alleged

court costs were not paid. The police had arranged with the Probation Department not to register

a payment and then stage a false arrest. Josephine Carroll appeared at the Arlington Police

Station and demonstrated that payment was made to the court where officer McNamee was

withholding proof he was already presented. Officer McNamee taunted Josephine Carroll making

Mickey Mouse ears at her. At Court Justice Sherman called it a clerical error, apologized to

James J. Carroll, III and released him.

XVII. Following these events, Officer McNamee filed false claims that he injured his hand

from the arrest of James J. Carroll, III when he had placed James J. Carroll, III in a cage car

and he drove the cruiser three miles to the station as well as typed a report at 65 words per

minute. Officer McNamee filed false charges against James J. Carroll, III claiming assault and

battery on a police officer. At court at trial, the credibility of Officer McNamee was immediately impeached and the actions proven to be completely fabricated with perjured statements a false reports made six months later with false eyewitnesses who were caught urinating on the property, damaging property and shooting guns through car windows. Officer McNamee has a history of abusing the public and his fellow officers as well as has an alleged alcohol problem. The false witnesses were said by other police officers to be undercover operatives for Arlington Police and this was said in the court lobby loud enough for the plaintiffs to hear as these officers were disgusted that they had to be there on a false matter where they made comments that he was their boss and they had to do what he wanted.

These false claims were dismissed against James J. Carroll, III after the jury found that James J. Carroll, III was not guilty and this was intentional violations of the rights of James J. Carroll, III Once demonstrating the facts to Justice Robert Bohn in Superior Court, he restrained the aggressors, stating that the plaintiffs "were dealing with dirty town politics and to sue the town." His honor and the plaintiffs did not know the extent of the true sinister plot until the situation worsened to the issues presented before this court and the plot completed the course .
Many events would connect back to James J. Carroll, Jr., his counselors, police
or town employees all creating separate controversies to make an appearance that suddenly following a divorce a quiet private residence on a private secluded street at the end of the town was suddenly a hot bed of regular conflicts. Neighbors noted the activities of police and individuals connecting to the town who were repeatedly trespassing and causing problems.
XVII. (Ultimately through a long tortious course of events from basic issues, a web of deceit has been woven to operate, maintain and cover fraud, crimes, manipulated actions and false documents to make an appearance of legitimacy, so in reality a swindle with licensed domestic abuse occurred with a litany of crimes and conversion as well as obstruction of justice to make a

29.

devious plan successful. The foregoing facts continually occurred while the entire story is made

to appear outrageous and incredulous with complex fraud to evade detection and accountability.

XVII

When all facts are shown, fingures will be pointed, excuses will be made and lies and deceit will

continue, when in fact each defendant and many others not named aided and abeited in the

creation of a grotesque situation to benefit the defendant James J. Carroll, Jr. and to ultimately

benefit themselves and their associates on total fraud manipulation of the system.

All shared their resources and positions, networking the system and conspiring in orchestrated

crime by, through and with the defendant James J. Carroll, Jr. along with many other individuals

mainly organized by his counselors and members of the Town of Arlington and their associates.

Many of these individuals aided in one way or another to make a grand scheme of fraud, crime

and racqueteering and abuse work for everyone involved including those who now claim to be

have become alleged owners of the residence of the plaintiffs and land which was part of that

realty. The facts which are complex will be made available to the court as prima facie evidence.

XVIII. In the matter where the defendant James J. Carroll, Jr. was prosecuted for receiving stolen

property at the Cambridge Third District Court, the criminal matters were dismissed and the case

was transferred to a civil court, Probate Court. where the court through justice Charles Bowser

ordered return of the stolen property to Josephine Carroll.

The defendant James J. Carroll never complied [Emphasis] remaining in contempt of court to

date. (See divorce decree for affirmation of this award.)

The court regularly never addresses any complaint or contempt to add burdens to the plaintiffs to

ensure the sealing of their fate.

XIX

A. These actions and the failure of the law to properly prosecute the defendant James J. Carroll,
Jr. then made it impossible to continue without encountering more conflict, more loss and
escalation of issues, as this unabated problem was used to continue an unrelenting course of
unfounded litigation and abuses leading us into the issues before this court.

XIX

B. The abscense of this costly equipment with a defendant who would not pay support made
maintainence of the property impossible in an exclusive neighborhood of well kept homes and a
piece of real estate that had finely maintained grounds and gardens this added to repair costs.

C. The refusal of the Town of Arlington, their police and or the courts to enforce the law
thereby denied the plaintiff James J. Carroll, III his tools for repairs, his ability to have these
items at his disposal interfering with his ability to remain employed, denying his rights to own
and maintain his own property needed for his employment, as well as helmuts for his motorcycle
needed by law for transportation in a state requiring this equipment. The plaintiff having to take
on all of the responsibilities of the defendant James J. Carroll, Jr. could not afford to replace
every stolen item the defendant James J. Carroll, Jr. and or his cohorts chose to steal or destroy.

D. The plaintiff James J. Carroll, III was intentionally stripped of his gun for hunting to prevent
any defense where Arlington Police openly favored the rights of the defendant James J. Carroll,
Jr. who no longer lived in Arlington. The maintainence equipment and the tools were replaced
for a second time, as it was seen less expensive to replace than litigate in an atmosphere of bias
and contempt for the rights of James J. Carroll, III and Josephine Carroll.

E. The defendant had taken the original marital items, long before stealing the replacements that
James J. Carroll, III purchased to assist his mother. The defendant James J. Carroll, Jr. with
counsel misrepresented the facts blatantly giving perjured testimony that the items he stole were
the original marital assets. This fact strongly conflicted with more recent cancelled checks, store

31.

receipts and invoices with the item serial numbers with recent dates, things that the criminal court had ignored. This issues were seen as trivial, but as the court will learn this was only the beginning of a grander scheme in the making.

XIX F.

The defendant James J. Carroll, Jr. began sending false complaints to the Arlington Police Chief John Carroll who began compiling an unknown false file against James J. Carroll, III and Josephine Carroll. The Arlington Police were notified that James J. Carroll, III had moved to New Hampshire and the FID Card was to be cancelled. Police never acted upon this request and instead acted on the false complaints where police began all types of harassing activities. The defendant James J. Carroll, Jr. alleged that Josephine Carroll and James J. Carroll, III were harassing him and quote "were trying to kill him for all of his money."

Police never made these complaints known and instead began a campaign of favoritism and assistance to the exspouse. Arlington Police began a course of false complaints, false stops, false arrests and stalking, as well as refusals to address any serious issue aiding in the harassment and deprivation of rights of the plaintiffs Josephine M. Carroll and James J. Carroll, III, covering their misdeeds with numerous excuses and passing the blame to the courts and the defendant James J. Carroll, Jr. Arlington sent notice that they were revoking the FID Card and to surrender any guns. The Police Chief was advised that the gun was reported stolen with the foregoing facts, but again police did nothing to recover the weapon being fully apprised that the defendant James J. Carroll, Jr. had stolen it.

XX. When shopping in a local supermarket Police Chief Carroll was encountered and when he saw the plaintiffs his face drained and he unexpectedly fled the store as if he was guilty of something and his conscience made him flee. Both Officer Carroll and Officer McNamee would follow James J. Carroll around town as would other officers, and both would often appear at his employers which at times were outside Arlington. James J. Carroll, III would receive stares from these officers that seemed scornful or vengeful. The animosity received from particularly Officer McNamee was without any provocation and with unknown basis.

XX A. The plaintiffs, James J. Carroll, III was never in trouble with the law and neither was Josephine Carroll. The Arlington Police file that was being created with staged false complaints was not known until further conflict and litigation years later.

B. At the start of divorce bizarre letters were placed in the docket to stage the events that followed again claiming that James J. Carroll, III told Joanne Carroll that Josephine Carroll was going to kill James J. Carroll, Jr. for all of his money. No such conversation ever occurred. Following this complaint, James J. Carroll, Jr. with the stolen shotgun fired a round into an unregistered car on the Bedford real estate at 120 Great Road Bedford. The defendant filed a false complaint to harass Josephine Carroll and attempted to falsely incarcerate her. Josephine Carroll never held a gun nor was licensed to hold a gun. The divorce attorney for Josephine Carroll alleged she accepted service from the partner of the opposing divorce attorney but forgot about the complaint and forgot to inform Josephine Carroll of the hearing causing a default and requiring an appearance before Justice Arthur Sherman in Cambridge District Court.
The complaint was dismissed after Josephine Carroll began crying advising his honor that she was not responsible for these acts and demonstrating a shopping bag of unsolicited mail with invoices for payment of cookbooks, christian mail and book track tapes entitled "Living Ragged." [Emphasis]

33.

C. His honor Arthur Sherman requested $200.00 court costs. Josephine Carroll informed his honor that she could not pay a dime as the exspouse refused to support her and instead sought every opportunity to harass and abuse her. His honor dismissed the action without a finding. XX. D. The defendant James J. Carroll testified to the court that Josephine Carroll fired a shot gun into an unregistered car to send a message that she would kill him and he testified that he was fearful that he would end up in the Lexington Dump like the notorious trajedy involving the Dunn Girl where justice Heffernan was removed from the bench for causing her death. The court roared in laughter due to the absurdity of the claims, as Josephine Carroll is a petite demure and frail elderly woman.

E. Upon investigation, Bedford Police Logs told a different story from what James J. Carroll, Jr. with his attorney presented to the court. Logs were found to contain several complaints of neighbors of James J. Carroll, Jr. stating that they witnessed gunfire from the second floor window of the home and that one neighbor complained that a bullet entered their door lodging in a wall nearly killing their infant child. Bedford Police would not comment on these events only stating that someone was arrested and was prosecuted in Framingham District Court. Facts revealed that the partner of the defendant Robert Costantino, counsel for James J. Carroll, Jr. defended that party and the facts were intentionally transferred against Josephine Carroll to cause extreme emotional distress, loss and deprive her of her Civil and Constitutional Rights. The purpose of these false allegations was to build a false record of staged claims on which to have a basis to file suit. That fact is again a crime by law. Josephine Carroll stated to the attorney for James J. Carroll, Jr. that she could understand that it was the job of the attorney to defend her exspouse but not encourage his behavior. The attorney replied an expletive "F.U." and Josephine Carroll reported him to the Board of Bar of Overseers who would only reply with "sue the attorneys".

34.

XX F.

Bedford Police reduced to writing that Josephine Carroll had no connection to the incidents

when asked to verify these facts. The defendant James J. Carroll, Jr. and his attorneys later

falsified the decision on what was used as libelous and defamatory records in other courts and

which was changed in legal records in the Probation Department from dismissed without a

finding to sufficient facts found to then use to harass and impeach the credibility of Josephine

Carroll. The plaintiff Josephine Carroll wrote a complaint to Justice Sherman who confirmed his

decision was without a finding.

G. At Cambridge District Court when trying to recover the stolen property, Thomas Begley, an

Arlington resident who happens to live near a Cambridge Deputy Sheriff (who operates a

benevolent society for sheriffs) acted as a assistant clerk magistrate and a bail bondsman who

reported to and worked with Arlington Police. Thomas Begley blatantly favored the defendant

James J. Carroll, Jr. and his attorney who could not supply proof of their claims, but none the less

Thomas Begley upheld them without proof while all of the pertinent facts were ignored and

debated by him. Because this clerk would not issue a criminal complaint nothing could be done

to enforce the law or to recover stolen property, violating the constitutional rights of the

Josephine Carroll and James J. Carroll, III to an entitlement as well as allowing a combative

spouse breaking the law to continue without accountability. The character of Thomas Begley was

made known to the plaintiffs by attorneys they consulted, who claimed at a later date that

Thomas Begley was prosecuted for a kick back scheme with Arlington Police, thereby taking

excess amounts of bail money not due from victims in their shakedown of innocent people.

James J. Carroll, III was one of those victims through many false arrests that followed the

35.

foregoing matters operated with Arlington police and the defendant James J. Carroll, Jr. who initiated false complaints. Each complaint was dismissed as it was found to be malicious and unfounded and blatant lies were disproven with no consequence to the defendant James J. Carroll, Jr. (Thomas Begley is not currently named in this action)

XX H. The false complaints filed by the defendant James J. Carroll, Jr. to attack his son James exceeded [22] complaints in various courts including Cambridge, Concord, Lynn. Many false complaints were sought against Josephine Carroll as well by the defendant who was trying to impoverish and damage the reputation of both James J. Carroll, III and Josephine Carroll as well as deprive them of life, liberty and the persuit of happiness seeking any opportunity to create conflicts and ultimately stop James J. Carroll, III from giving any assistance to his mother who was in need due to the refusal of James J. Carroll, Jr. to meet his legal obligations and for the courts or the system to enforce the law. These are forms of criminal harassment, abuse of process and violations of constitutional rights where attempts were made to strip the plaintiffs of life, liberty, property, the persuit of happiness, their freedoms or liberties and their right to hold property and or to bear arms. Constant efforts followed to interfere with "the peaceful and quiet enjoyment of their property" as provided by law on Registered Land Titles.

Many incidents occurred with the Town of Arlington both pre divorce and post divorce with various individuals who connected to the town, some restrained by the courts by ethical justices who wanted to stop the nonsense and saw the real agenda.

XX I. During the course of actions involving the theft of property which coincided with divorce proceedings, the defendant James J. Carroll, Jr. hired twelve lawyers who withdrew.
This conduct exhausted a $240,000.00 marital bank account which was accumulated for retirement through the efforts of Josephine Carroll. As a result Josephine Carroll was deprived of her lawful share of the account spent on defense which legally was to be paid by the defendant

36.

since he initiated divorce proceedings. Each attorney for the defendant James J. Carroll, Jr. approached Josephine Carroll in Probate stating, that they would not meet the demands of James J. Carroll, Jr., adding life was too short, that they felt truly sorry for Josephine Carroll apologizing to her directly. Many stated, as ethical attorneys, they wanted no part of this divorce case.

XXII. At conclusion of divorce many decisions did not coincide with the facts and the evidence presented to counsel. Facts were found that the defendant James Carroll, Jr. pledged half of real estate he did not own for a loan secured in the East Cambridge Savings Bank. (False Federal mortgages on false titles which were procured with aid of his counsel claiming "married" to Josephine Carroll in 1994-1996 continued this theme post divorce when the parties were divorced in 1989.)

XXIII. During the divorce trial at time of divorce decree, Trust accounts of adult children who became adults well before any action taken by Probate Court on their respective accounts were unlawfully seized by court order in the divorce action where no notice was given to the rightful owners and the adult children were not parties to a divorce of their parents.

A. By law, property of adult children can not be seized or commingled with a divorce of their parents where they held no connection. This is commingling of rights and responsibilities, confusion and conversion. This Probate order occurred without notice or service to the proper owners through the East Cambridge Savings Bank and the proceeds of $100,000.00 on deposit were diveyed out to the divorce attorneys and James J. Carroll, Jr. on perjury, withheld documents of 25 years of constant reinvestment and misrepresentations. The misrepresentations were that accounts were manipulated marital assets contrary to 25 years of bank documents. This is Fraud and conversion [Emphasis].

37.

XXIII B. The accounts were held under each respective child's social security number where each adult child paid taxes to the I.R.S. on their respective account. By both I.R.S. code and state law this property belonged to adult children on their eighteenth birthday. The children had already surpassed that age. This is denial of due process, theft, conversion and similar to escheat since the court and essentially the Commonwealth of Massachusetts seized property unconnected to a divorce without notice and without proper juristiction. Complaints to Attorney General, the District Attorney, the F.B.I. and the police were made without redress and with blatant refusal to act. The East Cambridge Savings Bank would only answer with "Court Ordered" whereby the bank refused to provide records or make required 1099 forms. Funds were taken by the attorneys contacting attorney Leonard Frisoli for East Cambridge Savings Bank whereby complicity of the bank and their attorney facilitated the successful theft. Josephine Carroll as a fiduciary as well as the East Cambridge Savings Bank as a trustee were both liable to maintain these accounts for the benefit of the respective recipients.

One can not stop the abuses of a court, of attorneys or any other party except through actions of a suit for damages in and recovery in an untainted forum when all other alleged safeguards inexplicable fail to exist. Appeals were blocked and ignored. (See Divorce Decree.) (Records of complaints available.)

This is fraud and abuse of power which raised more questions since many factors demonstrated manipulations and fraud by the attorneys and what appeared as participation of the divorce trial judge with the attorneys and the defendant James J. Carroll, III emphasized by revelations following the intervention of the Chief Justice Alfred Podulski.

XXIII B cont'd.

The defendant James J. Carroll, Jr. made malicious false complaints to I.R.S. claiming that the plaintiff Josephine Carroll received these funds. The I.R.S. investigated sending Miss Kathleen Brown of the Fraud Division to review all documents. Miss Brown determined that the complaint was false using the findings listed in the divorce decree as basis for disbursal[s]. The I.R.S. ordered that each recipient be listed on 1099 int forms as the East Cambridge Savings Bank refused to make required tax forms, as required by Federal Tax law as I.R.S. code.

C. Complaints were made to FDIC and the Massachusetts Banking Commission which claimed that it was a matter for the courts. Attempts to appeal the decision in Probate were blocked with excuses. James J. Carroll, III motioned the court to file and equity complaint and or join the divorce case, but clerks refused to file the action only stating you are not part of the case and you can not file in this court which is entirely wrong.

Attorneys who were made aware of this issues failed to address it. Josephine Carroll requested her file from her attorney who delayed and refused to release records until expiration of appeals.

D. After complaint to the Supreme Judicial Court to staff attorney Pamela Lyons, it was agreed that what transpired should not have occurred and was prohibited by law.[Emphasis] No remedy was made by Arlington Police, the District Attorney, the Attorney General, the Commission on Judicial Conduct, the Board of Bar of Overseers or the court system to address the issues other than to ask to address the issues in Probate Court which were never addressed because of ongoing abuses and obstructions.

The defendant James J. Carroll, Jr. sent a copy of the I.R.S. complaint letter to the plaintiff Josephine Carroll to cause extreme emotional distress, adding a note, stating, quote, "This is for your birthday" unquote.

XXIII D.

The letter was mailed to coincide with the birthday of Josephine Carroll. This action involving theft of bank accounts of unconnected parties should be viewed as abuse of process, and an unlawful seizure under the [4th] fourth amendment of the Constitution as well as an issue of fraud and theft or embezzlement with bank fraud. (Please see divorce decree for issue concerning trust accounts.

E. Non marital property which could not be divided in a Probate proceeding affirmed by staff attorneys for the courts was awarded which was a crime of conversion under state law and a crime of embezzlement under Federal Law. By law no court is or any party connected to it is allowed to be used to commit a crime. Massachusetts law states if an action is prohibited by statute, good moral conscience or public policy it is considered void by law and unenforceable. Void contracts as will be shown have been created in this case, can not supercede lawful rights which again is the fact behind grievances presented to this court.

F. An unsubstantiated severely undervalued amount of $25,000.00 was allowed as value for a jointly created business which was also allowed to be placed and maintained in a Professional Corporation created during the divorce. That fact is what the law deems to be a fraudulent conveyance and fraud to deny division or payoff of entitled assets to Josephine Carroll as provided under law in a divorce.

G. The true income of the defendant James J. Carroll, Jr. was never substantiated as he would not provide tax statements and the court never forced him to produce them.

The attorney for Josephine Carroll demonstrated deposits from the defendant James J. Carroll, Jr. in excess of $100,000.00. The defendant James J. Carroll, Jr. attempted to downplay these facts claiming he was in debt and making the case into a circus claiming he had to buy clothes at

40.

XXIII Morgan Memorial demonstrating old shoes he intentionally had worn beyond repair and a moth eaten jacket he retained from college 40 years prior. The defendant bought a second business with an office and a lab with secreted marital assets and valued [2] two businesses at $25,000.00 when one business normally sold for $300,000.00 or more. Two bank accounts were found to be created by the defendant in the amount of $60,000 total held in the Essex bank under the name Richard Carroll.  Richard Carroll had reached 18 years of age and had no such capabilities for this income at that time, as he was a college student. This was fraud and secreted hidden assets.

H. During divorce proceedings the defendant alleged Josephine Carroll had hidden money transferring what he did against Josephine Carroll and their son James on clearly bogus claims. The basis of these claims were not made known by the attorneys until the eleventh hour revealing that the East Cambridge Savings Bank added a zero in error to a $30,000.00 account and the defendant insisted it was hidden money that the plaintiff Josephine Carroll had secreted. The plaintiff Josephine Carroll during the marriage received income from the defendant James J. Carroll, Jr. who made the tax forms, so such claims were without merit.  With no proof or investigation, Probate Court stopped all support to Josephine Carroll on the foregoing allegation in violation of state law denying her any ability to survive as the court had frozen all assets.  This was bias, an act of gender discrimination against Josephine Carroll and an unfair advantage, as well as financial control and licensed domestic abuse as well as actions prohibited by law under M.G.L. ch 208.  This was a denial of Constitutional Rights as Massachusetts law prohibited denial of support to a  long time wife as it is called abandonement a misdemeanor. The adult son James had to support his mother for a year and one half at the expense of his life where he was never compensated.  Massachusetts law prohibits any justice from deny support, alimony or maintainence once ordered if it will place the recipient on the public dole.

XXIII I. Through 17 years of ongoing stalking and abuses James J. Carroll, III had to maintain the welfare of his mother with extraordinary added costs and losses in many ways which are more than just financial. The Probate Court therefore operated a legally void position upheld on false claims with no factual basis and then deprived the plaintiff Josephine Carroll of her basic rights, discriminating against her while favoring the defendant James J. Carroll, Jr. for what was unknown reasons, but becomes lucid when all facts are compiled. These deprivations then stripped the plaintiff James J. Carroll, III of his rights who in good conscience could not see his mother starve, lose a life of arduous work and be placed in a shelter after all of her efforts and contributions to the family and who in reality never harmed anyone.

J. The Probate Court never allowed the debts incurred to James J. Carroll, III into the record, although the claims of the defendant James J. Carroll, Jr. were proven false and Josephine Carroll was exhonerated. Again, Josephine Carroll and James J. Carroll, III were harmed by actions of the defendant, the attorneys and the court.

K Due to non support at close of the divorce in October 1989 expiration of 90 days of decree nisi, dated August 25, 1989 by Bowser J., the nonsupport placed Josephine Carroll in tax title for three years of unpaid real estate tax. This should be seen as an issue caused by the Commonwealth and by actions of attorneys with the court system who placed Josephine Carroll and James J. Carroll, III in this precarious situation. The plaintiffs overcame this onus through their sacrifice and savings paying $10,000.00 to stop foreclosure. The Town of Arlington then followed by raising taxes substantially with no apparrent reasoning. The assessor the defendant Billafore claimed he raised the taxes on the allegations of the defendant James J. Carroll, Jr. who no longer lived in the town. A heated argument followed by an appraisal corrected the matter.

XXIII K cont'd.

The Probate Court failed to address this fact placing a life of work and the real

estate in jeopardy of loss for [3] three years of tax arrears. The U. S. District Court should note

that Massachusetts law requires an exspouse and minor children when applicable to be kept in

the same standard of living they were accustomed to during the course of the marriage. Keeping a

medically ill elder below poverty who was formerly a wife of a doctor drastically contrasts this

requirement.

L. By state law, the entire value of the real estate can be taken from the owners if taxes are not

paid by a deadline and that law should be seen as unconstitutional as noone should be gouged

and basically robbed of their largest investment on a simple debt. This was the initial tactic to

drive Josephine Carroll from her home. The Town of Arlington rushed to foreclosure, but the

Town of Bedford stated the town assessor would wait for payment on real estate there. Tax

seizure was abated by the plaintiff James J. Carroll, III who paid the real estate taxes to stop

seizure and maintain a home for Josephine Carroll. The attorney for Josephine Carroll in the

divorce sent letters to Josephine Carroll stating, that she wished that judge Bowser had addressed

these issues.

M. In retrospect this was the first attempt to drive Josephine Carroll from her home with

members of the Town of Arlington and now what appears as a constantly revised plot to take

any and all assets from Josephine Carroll and James J. Carroll, III as well as those entities they

were legally and contractually liable to protect. Josephine Carroll as a trustee had a legally

binding relationship where she could not revert assets to herself under M.G.L. ch 266 section 57.

Trusts avoid probate by law ; are non divisible marital assets and property of adult children is

unconnected to a divorce of their parents as are trusts.

43.

XXIII N. Due to the many inconsistancies in the divorce decree, the obstructions met in the court

and the denial of rights before the courts, the Chief Justice of Probate Court, Alfred Podulski was

said to be infuriated when he heard of the many issues of fraud and thereby intervened.

Chief Justice Podulski, his honor exposed a great deal of the fraud.

O. Chief Justice Podulski exposed the following issues in Divorce Docket 86D 1651;

1. Non divisible property was awarded.

2. Values manipulated.

3. Unlawful exparte communications and arrangements with the judge

4. Forged deeds and illicit liens between the attorneys and the defendant James J. Carroll, Jr.
(Records available)

5. False documents

6. Setups or framing with conspiratorial acts with deputy sheriff Steven Donnelly to falsely arrest
intimidate and coerse James J. Carroll, III and Josephine Carroll while attempting to injure them
on false fabricated court orders. [Emphasis] The divorce trial judge Charles Bowser, had
accepted illicit ex-parte communications from James J. Carroll, Jr. who requested a personal
loan of $10,000.00 and to call him right away as well as demands not to show the letter to
anyone. These acts are prohibited by court rules and ethics law.

P. Justice Bowser had issued a capius for the arrest and prosecution of James J. Carroll, III on
allegations of violation of a restraining order by the defendant James J. Carroll, Jr .
No restraining order was in valid existence. James J. Carroll, III was not a party to the divorce ;
was never subject of any valid Probate proceeding and had a "writ of protection" on file in
Probate Court prohibiting arrest as an out of state witness in a Massachusetts case. The facts were
later exposed that Justice Bowser never investigated the docket, accepted a falsified, altered
vacated restraining order made to appear effective by the defendant James J. Carroll, Jr. who then
claimed violation. There are issues in this case which show illicit activities behind the scenes.

44.

XXIII P cont'd.

These facts were exposed in Probate Court after James J. Carroll was jumped at or about one half

hour after twelve midnight by deputy sheriff Steven Donnelly, defendant of the Middlesex

Sheriffs Office. The deputy appeared at the residence of Josephine Carroll on a private way

posted no trespassing under M.G.L. chapter 266 section 120 D., a criminal trespass. The deputy

sheriff loitered in an unmarked Ford Sedan in plain clothes. The deputy confronted James J.

Carroll, III upon arrival with another man and the deputies refused to identify themselves

displaying plain clothes. James J. Carroll, III recalling that his father, the defendant James J.

Carroll, Jr. threatened that he would quote "fix him" immediately became concerned for his

safety on a dark secluded street. The deputy sheriff Steven Donnelly jumped the plaintiff James

J. Carroll, III after slamming him into a garage door, forcing his hand through a garage window

and throwing him to the ground causing many serious injuries. The deputy forced his 350 pounds

of weight into the base of the spine of James J. Carroll, III to cripple him twisting his spine.

[Emphasis] (Documents available to prove injuries)

The deputy caused a concussion, a bruised trocantur, compacted vertebrae, a lacerated wrist, a

split retina causing blindness and macular degeneration. [Emphasis]

James J. Carroll weighed 160 pounds.

XXIII Q. The deputy alleged he was arresting James J. Carroll, III for a violation of 209 A

restraining order and attempted to do the same to Josephine Carroll who heard motion detectors

sounding alarms, heard yelling and ran outside witnessing the assault as it occurred.

Josephine Carroll confronted this man was and he replied quote, "the police." [Not a

Middlesex Deputy Sheriff] [Emphasis]

Josephine Carroll retorted Police do not act like this. I am calling the state police. The state

police summoned Arlington Police who arrived with guns drawn. The deputy called to his

partner to call the Arlington Police and let them know that both of these deputies were at this

address. This is not procedure, as deputies must notify police.

45.

XXIII Q cont'd. Arlington Police stopped the deputy from taking Josephine Carroll stating they knew the controversies around the home and that they knew that Josephine Carroll was a medically sick woman who could not be arrested without a matron nor would be as they demanded she appear in court on her own recognizance. [Emphasis]

R. Sargeant McNamee an Arlington Police Officer, defendant, arrived at this scene. James J. Carroll, III was taken to Symmes Hospital which only looked at the laceration and the bruise on the forehead. The following day after release of confinement the injuries were documented through Harvard Health physicians. The plaintiff James J. Carroll, III was taken to Cambridge District Court 17th floor to jail and held over night where he began to beg for medical care suffering in extreme pain.

S. Officer Ferreira threatened James J. Carroll, III to quote, "Shut up or he would be placed with common criminals who would make mince meat out of him" unquote. Complaint was made in the morning to a female officer who summoned the captain who as apologetic. Deputy Sheriff Donnelly publicly escorted James along 100 Cambridge Street in Cambridge where James was humiliated and publicly displayed as a criminal before neighbors passing by and an attorney he knew.

T. At Probate Court James J. Carroll, III was threatened by justice Bowser that if he did not pay $300.00 that day he would be in jail for two weeks. This was extortion because there was no legal basis for arrest and the deputy had no arresting powers on restraining orders. This was a crime. An attorney retained for James J. Carroll, III proved to the court that James J. Carroll, III did not belong in Probate, that the restraining order and violation were fabricated and the deputy had no arresting powers on restraining orders by statute. [Emphasis]

46.

XXIII T cont'd. Therefore, this was an orchestrated kidnapping and criminal assault and battery for hire under the law disguised as "color of law".[Emphasis] The deputy fearing suit was overly accomodating to James J. Carroll, III stating, that James J. Carroll, Jr. offered him quote, "double his arresting fee and new clothes to arrest the you and your mother." The deputy also claimed that he thought the defendant James J. Carroll, Jr. was weird and showed him pictures of his guard dog and a snake.

Complaints were filed with the Civil Rights division of the F.B.I., whereby the agent agreed these were civil rights violations. The end result was that justice Bowser ruled that James J. Carroll, Jr. the defendant, committed fraud on the Probate Court and lost all credibility with the court. [ Emphasis] (SEE EXHIBIT That James J. Carroll, Jr. Committed fraud on the Probate Court)

This ruling was publicly recorded and microfilmed. Clearly, these are illicit acts of conspiracy to deprive one of their Constitutional Rights and protections under the law, as well kidnapping, felonious assault not to mention issues of corruption, violations of state ethics laws and many other issues which are issues triable before the U.S. District Court. Nothing frivolous or meritless exists with unabated behavior which is a common thread through this case involving the same players causing repeated injuries and being in a position to deny rights and remedies. The injuries and the proof of payment is available to the court. This deputy sheriff once again plays a part in the current fraud and injuries suffered by both plaintiffs in the events preceeding August 5, 2002 and on that date with the robbery of all assets as does Officer David McNamee with the defendant James J. Carroll, Jr. who have known each other for many years and who hold a friendship with each other.

XXIV.

The Commission on Judicial Conduct found that justice Bowser had given away property in not only the Carroll divorce case but another case involving attorneys and this judge who committed elder abuse financial abuse. Without contest, since the deputy sheriff had no arresting powers under law, then this was a criminal kidnapping for hire and a hired hit for assault and battery and deprivation of rights, an unlawful intrusion by government as a representative of a state agency bribed, affirmed by his admission and documentation where he acted outside the lawful permissible scope of his authority , as well a conducted a false arrest which can be viewed as an illegal search and seizure of a person and their property. (In this instance property was personal possessions and payment extorted by Probate Court under duress and threat of 2 weeks of unwarranted confinement.

XXV. On or about January 10, 1990, after Chief Justice Podulski intervened, the truth was exposed. Justice Bowser stopped conveyance of real estate to James J. Carroll, Jr., recused himself and was removed from the bench. His honor was said to be unwanted as a judge by the Commission again.

XXVI.                   Related facts from past to present

Through investigation of discoverable facts, many issues connect many of the players throughout this case to one another and each have positions and relationship that aid each other and will . Throughout actions James J. Carroll, III and Josephine Carroll have had no contact whatsoever with James J. Carroll, Jr. except in the courts, so any claims of James J. Carroll, Jr. were blatant lies proven with facts in many cases.

It is the position of the plaintiffs that the many individuals who are involved in the current basis for complaint conspired and facilitated crimes for, with and through the defendant James J. Carroll, Jr. to ultimately work the controversies they created to benefit themselves and their cohorts injuring the plaintiffs in far too many ways to elaborate, shattering their lives while swindling them of everything and ultimately stripping them of life, liberty and property as well as

48

XVI cont'd.

any remedy which should normally be available as a guarantee under state law and municiple

services paid through taxes which derived from their income. Some of these individuals through

their proximity to one another, positions, friendships and or business relationships connect to one

another where the entire picture and activities show a "meeting of the minds" with a covert

illegal agenda amounting to racqueteering and conspiracy and a swindle because one can not

arrange false papers and with people to cover and maintain abuse and crime, overtake property of

another and wash it through another person who never held proper title, steal, intimidate and

assault in the process and then call whatever they wanted theirs.  The defendant John Gahan,

III through compiled evidence was the receiver of stolen property, arranged with many others to

work to his benefit and anyone else who assisted. On this note, through all of the fabricated

events, the defendant attorney John Gahan, III calls 7 Oldham Road Arlington, Massachusetts

"his property" after moving in and gutting the home and remodelling it to his liking causing

extensive losses and devaluation to the property as well as title issues and property damage

issues. These actions occurred with intimidation tactic and threats of arrest with Arlington Police

while the defendant Robert Murray subdivided the unbuildable land [Emphasis] creating an

unlawful lot according to state law and zoning, thereby creating 9 Oldham Road,

Arlington, Massachusetts. The former selectman then sold the property to the newly appointed

Town Manager for Arlington Brian Sullivan thereby calling it "his property".  Brian Sullivan

lived in North Andover near a Land Court Recorder involved in this situation, near an Arlington

Redevelopment Board Member and near a State Trooper who has harassed James J. Carroll, III

and was threatened with Court Marshall by his superior after an unlawful stop and stealing the

auto without cause James J. Carroll, III was driving leaving him stranded on a highway at 1:45

a.m.  These individuals also live near the judge used to secure the bogus judgement on which

all scheming is based. There are many more connections and facts that show conspiracy.

XVI. The former selectman Robert Murray is on the planning board where all

have connections to one another in real estate speculation. Evidence shows all worked together in the plot to defraud, injure and convert property to themselves. Evidence shows tax records fraud, false mortgages which are elements of flipping, or equity skimming and are these issues are serious crimes. There are many other disturbing facts that show that these parties and their associates have injured many others with the same activities. Disinterested witnesses have stated that the defendant John Gahan, III was making statements in Belmont where he formerly lived that, quote, "There is a really nice home in Arlington that I want." and that was why he was going to move. [Emphasis] We factually saw attorney Gahan directing attorney Costantino what to do and attorney Gahan has directed all the activities. The law firm of this attorney has been sued by the state of Connecticutt on Fraud and the firm has been involved in many major scandals. Attorneys have confirmed that attorney Gahan was the mastermind with the Town of Arlington.

XXVII. This allegation and assumption through compiled injuries and facts has been thoroughly affirmed as the total truth by many high profile and highly ethical attorneys who confirmed the worst suspicions of the plaintiffs.

Under Federal Law these actions can be viewed as racqueteering under the RICO statutes and under state law are theft by trick or deceit, malice aforethought, premeditation, complicity, conspiracy to defraud, conspiracy to violate civil rights and a host of felony crimes.

XXVIII.

One can not fabricate a case to defeat preexisting legal obligations and then build false papers, false litigation, rampant, fraud, strongarm and intimidate, steal and batter and build successive crimes and torts, payoff officials to change all final awards, defeat orders of restraint and convert property of others not subject to any suit or legal detriment for unjust enrichment, while continuing to defeat all legal obligations ; to commit domestic abuse ; to injure an exwife with no basis ; to do the same to an adult son and then call it law essentially nullifying a divorce and property titles, entitlements and awards making everything one sided and turning an alleged award into a six fold plus profit. It must be emphasized that no other action could legally be used to defeat and overthrow orders of a divorce decree and a court of original juristiction which is Probate Court.

Noone can sell property that they obtained through fraud and manipulation and have associates to a plot already restrained, thereby aid in the conversion an dissemination of what is stolen property while claiming legitimacy and a superior legal right, when under no circumstance did the aggressors ever possess any proper legal standing or have any legal title, nor could they by law while continuing to obtain actions that again are void to threaten, intimidate and obstruct justice.

Through the rampant and unabated assaults endured by the plaintiffs, the defendant James J. Carroll, Jr. with his counsel would work many events without notice, on onesided covert actions which were then forced on the plaintiffs jointly and severally to cause surprise, to injure to entrap to cause extreme emotional distress and trauma and to cause loss and repeated disruptions to their lives. As a result of the false arrests James J. Carroll, III endured and the stripping of alimony from Josephine Carroll combined, James J. Carroll, III had to drop out of College and because of these issues he has lost his possessions needed for employment as well as his comforts, being dispossessed from his home and having his auto stolen. All opportunities to build his own life and control his own destiny have been abashed. Because of the constant strife

James J. Carroll, III has had no social life, no peace no advancement, no comfort whatsoever

adding many burdens causing him extreme emotional distress and mental anquish. James J.

Carroll, III has been traumatized by a system he can no longer have faith in and trust fears

reprisals from a group which is without question organized crime who has shattered the lives of

both plaintiffs. Many attempts have been made to separate James J. Carroll, III from his mother

and that could be seen as similar to loss of consortium.

There are many events which will not be highlighted in this brief for judicial economy,

but actions involve the official use of court, state, municipal and law enforcement resources by

individuals breaking the law and betraying public trust for private gain to aid the scheme against

the plaintiffs with no fear of reprisal or accountability, because the blame would be passed to

someone else like James J. Carroll, Jr. or accountability would be evaded altogether, thereby

facilitating continued injury, invading privacy, criminal stalking, credit invasions and using

official resources to stalk the plaintiffs such as "ACIS" (Court Credit Information

System that reports to the courts) thereafter implementing theft, identity theft and credit card

fraud as well as mortgage fraud. (Documents available)

Through these alliances wire tapping of telephone lines were made, false subpoenas sent for

retreival of unlisted numbers and related records on protected records. Peeping

tom activities were employed with criminal trespasses and breakins to autos and into the

residence of the plaintiffs made with the apparent consent and participation of Arlington Police

and Town Officials. Keys were copied through false arrests, credit card numbers copied through

false arrests, unwarranted audits followed and dissemination of tax information were obtained to

find employers through Department of Revenue thereby opening a new wave of crimes/torts in a

long list of criminal / civil issues that followed to get to one goal and that was knowing the

activities of the victims to continually attack, increase expenses, cause extreme emotional

distress and deprive them of all of their rights to abscond with any asset under false pretense.

52

The reasoning for these activities may be a jury question and may be presumptive for anyone to

claim why these individuals chose the course they worked, but the facts show complicity to

deprive rights, crimes and shared relationships where all benefitted in some fashion on a plot

they devised and maintained to defraud innocent parties. Some issues which may have

contributed is greed, jealousy or envy of things that these people did not possess but sought to

make possible, hatred for women where some of these individuals were divorced themselves and

may wish to do to another woman what they could not do to their former wives. Another reason

can be a chauvenist attitude where these are men who act as if the elderly and women are objects

to abuse, exploit, demean and place below them and therefore deny their rights because they

perceive women as the weaker sex and men superior. These issues directly apply to VAWA.

Another factor which is clear is the attitude "catch me if you can" where it is a

game to sadistically abuse, torment and gain from taking advantage of another, working bias

strongarming, terror tactics and friendships to aid one another. It is most certainly a mixed set of

issues. Sometimes people do things for the most irrational of reasoning and noone can truly

justify theft, robbery or assault or defrauding another. At least for the defendant James J. Carroll,

Jr. obsessive behavior, greed, selfishness and animosity towards the plaintiffs is more than clear.

Many reasons can be created to pose as justifiable right when in fact the law clearly states it is a

wrong and the facts in this case support that the plaintiffs have been terribly wronged.

The court should ask if anyone can justify the mugging and injury to an innocent

elder who never harmed anyone. The question maybe as absurd as the events in this case.

What these individuals have done to an elderly ill woman is as viscious, evil and attrocious as

injuring a baby and then laughing and acting like it is an a great victory. It is sick and sadistic

behavior highly injurious behavior designed to make Josephine Carroll have a fatal heart attack

or stroke and to send a message that Josephine Carroll, and James J. Carroll are nothing ; are

people without power and without rights.

XXXII cont'd   responsibilities and work fraud to enrich themselves and those alligned with one

another.  One's home is supposed to be one's castle and Massachusetts Law has the Castle Law,

laws against domestic abuse, laws against elder abuse, laws against theft, the Victim Witness

statute which is to keep Massachusetts citizens free of crime at all times and the defense of

marriage act as well as defense of constitutional rights through the Massachusetts Charter which

is to allow greater rights all conflicts with the end results and the actions in the case which are an

elaborate rouse or sham confirmed by many legal professionals. The complexities in this case are

great.  Although this behavior has already been proven repeatedly in the Massachusetts courts

such as  in Superior Court actions 98-2825 and 95-6545 as well as Concord Court criminal case

95-1248  this betrayal of the public trust continued to be utilized to make appearances of lawful

duties which are in reality criminal acts and civil torts hidden under color of law because the

entire plot and actions called legal matters were prohibited by Operation of law, prohibited by

court orders awards and many statutes and were totally fabricated and devised in conspiracy with

members of  the system who ultimately stood to benefit. Actions were intentionally made to

appear as legitimate and were no more than nullities or void acts by law, which then created

opportunity  to further a scheme and operate more crime and torts under the existing plot

working with others in the plot to evade detection and accountability then placing greater

hardships and obstacles against the plaintiffs to benefit the associations of all involved.  It is the

classic conspiracy.  The basis of all actions "posed as law" causing the injuries presented to this

court are succinctly stated as "a legal sham" and "a judicial sham", built on false documents,

staged proceedings, cases which never were worked as required according to process and law,

thereafter having falsified judgements, altered events on dockets and maintained one sided cases

without hearings to insure a victory without any due process on pure fraud.

XXXIII

The end result is torts and crimes under law as emphasized by the F.B.I and by numerous

attorneys. Some of these prominent attorneys emphasized that the injuries sustained were due to

the use of relationships and one attorney who was a former U.S. Attorney stated after

investigation that the events in this case were due to quote "a bought case", emphasizing public

corruption interwound with organized crime and domestic issues. Documents can be shown to

prove these facts. Other cases can be shown that this conduct has already been proven to be

employed through the courts involving some of the same participants. The case is too convoluted

and fact intensive to paint a clear picture through one brief and one hearing.

The tainted, slanted and biased behavior directed towards aiding James J. Carroll, Jr with many

criminal activities and protection where entrusted public officials were enlisted to aid in crime

can be at a minimum neglect of official duties which can be simple negligence or criminal

negligence, if the activities become clearly egrigious. Without any form of protection, public

integrity and or accountability from those responsible to render it, one must find a higher

authority to impose the accountability and enforce the law. The actions and the ongoing events

with the improper responses and preorchestrated actions can be seen as wanton and wreckless,

premeditated events to serve several purposes, but most of effect harm injury and unjust

enrichment, concealment, obstruction of justice and allowing the higher standard of criminal

negligence to be the real fact. Again, silence is assent under the law. [Emphasis]

A. Following the divorce of the parties, from the date of divorce decree, August 25, 1989 to date

the defendant James J. Carroll, Jr continued to remain in contempt of court, refusing to pay

supplemental alimony payments, amassing well over $1 million dollars [$1,000,000.00 ]

[Emphasis] of supplemental alimony arrears from successive weekly contempts and statutory

interest, all of which was continually bypassed and ignored in favor of fraud an abuse to allow

issues to escalate and to entertain fraud and conduct that was clearly prohibited by law. Due to

attorneys judge shopping and unlawful covert use of the system for unlawful private gain, the

truth, the law doctrines and rights were all ignored to cause all of the issues before this court.

One can not seek equity without doing equity under the clean hands doctrine.

XXXIV

Financial abuse as a tool to deprive basic rights and to cause loss, mental anquish, emotional

distress as well as injury was utilized repeatedly to deprive Josephine Carroll of her rights where

the alimony which was free of all legal process by both Federal and State law was denied the

Josephine Carroll, diverted and diveyed out to others on false pretenses contrary to M.G.L. ch.

208 section 34 and other such state laws, as well as 42 U.S.C. title V where funds were free of all

legal process once garnished and awarded as alimony debt. The order or [Q.D.R.O.]

qualified domestic relations order in the divorce decree nisi was defeated by misuse of power and

use of total fraud contrary to law and court procedures. The order in the divorce decree was an

entitlement to Josephine Carroll because the defendant James J. Carroll, Jr. had a successful

business and refused to support Josephine Carroll, self employment wages could not be

garnished, so a means of alimony required garnishment of the U.S. Postal Pension of James J.

Carroll, Jr. with a weekly out of pocket payment as supplement.

A. The Qualified Domestic Relations Order comprised of a combined payment of basic alimony

derived from the postal pension of James J. Carroll, Jr. payable to Josephine Carroll through a

garnishment order along with supplemental out of pocket payment required by James J. Carroll,

Jr. to equal an amount of five hundred dollars [$500.00] per week or twenty six thousand dollars

per year or [$26,000.00/yr] which is substandard according to statistics for a single person

operating a home in Massachusetts, none the less a former wife of a doctor. Payment was to

initially to come from the postal pension or the Administrators the Office of Personnel

Management. The defendant James J. Carroll, Jr. never paid the supplemental alimony amassing

an unextinquishable debt by Massachusetts Law which accrues penalties of 12 per cent interest

per M.G.L ch. 231 sections 6 J through 6 K inclusive amounting to well over $1 million dollars

of successive weekly contempts which continue to date unabated. Josephine Carroll filed

57

XXXIV. Cont'd.

repeated contempts of court, but all were blocked and ignored and hiring attorneys from legal

services were ignored as well and or retaining private attorneys were also useless, because the

attorneys stole retainers and or did nothing or played along with a clearly illegal agenda.

Together the group of defendants conspired to obstuct justice and conceal crime which they

devised, implemented and maintained.

XXXV

Statistically, a single person in Massachusetts not operating a private residential property which

takes greater income due to real estate taxes and maintainence, is required to have a minimum

income of $55,000.00 according to income standards and the cost of living. $26,000.00 which

was actually reduced to $11,000.00 to $15,000.00 at best when the plaintiff was receiving partial

alimony is most certainly substandard and again failure to pay alimony under Massachusetts law

is a misdemeanor called "Abandonement." One can not address these issues when fraud is given

precedence over law, obstructions are intentionally placed in one's path and each agency who

under law should be enforcing the law evades all responsibility and in some instances is instead

used to aid a criminal effort. One would believe that a lawyer could be retained to address these

simple issues, but retainers have been stolen and criminal acts of attorneys have been blatantly

ignored by not only the law, but the disciplinary agency called the Board of Bar of Overseers.

Complaints and records are available and records can be subpoenaed as well.

A. Due to the facts in this case, the issues were presented to two former Chairmen of the

B.B.O. when serving the board. Each agreed that the activities of the attorneys in this case and

the crimes and torts against the plaintiffs and the U.S. Government were criminal and ample

grounds for disbarment, but in the alternative each claimed they could not overstep bar counsel.

Ethical justices of the courts have asked why the B.B.O. and the Attorney General have failed to

enforce the law. As the facts will show, this again appears to be due to relationships and in the

worst case scenario a coverup as attorneys have alleged. Therefore, one can not make the law

58

work when it is so fatally flawed and corrupted to self serve those engrained in it over those who seek help before it. Trial by fire or by lynching with a mob mentality without ever committing a wrong is not justice by any standard of law.

XXXVI

Many onuses continued with unrelenting combative unfounded actions which resulted in entirely stripping away this alimony entitlement on fraud and overstepping both the state and Federal law. Once a decree became final following expiration of 90 days of the order, the alimony could only be amended but not eliminated. These acts occurred to intentionally make the plaintiff Josephine Carroll destitute, so that Federal Funds could be stolen and diverted through illegal conduct of the attorneys operating with select justices and the defendant James J. Carroll, Jr.

A. Through a process of bank fraud wire fraud and mail fraud, false orders, fabricated actions, conspiracy against the U.S. Government occurred where the resulting transactions should be seen as money laundering with wire and mail fraud. The exact details will follow and lead to sanctions through Justice Quinlan in Superior Court case 98-2825 that again were defeated with fraud and networking.

$26,000.00 of U.S. Treasury funds earmarked for basic alimony were placed into the hands of the Office of the Chief Probation Officer of the Probate Court from a court order of Beverly Boorstein and O.P.M. sending payments to an escrow account held by the Chief Probation Officer, while Josephine Carroll was reduced to below poverty. The total funds and the disposition of them were never accounted for as noone in the court would make that possible and entertain an accounting. Please refer to June 1998 and thereafter to note the related conduct. Clearly, no state court can legally overstep Federal law when the terms of a divorce decree which never changed had long existed unchallenged. Any relative changes to a divorce would then require an amended divorce decree to result in such a change and again no lawful change ever occurred. Again, this and many other facts emphasize fraud, crime and abuse of power as well as what new justices in Probate Court see as Contempt of Court.

April 1990, post divorce following the decree of August 25, 1989, the defendant

James J. Carroll, Jr. filed a Modification Trial in Probate with his counsel, a personal injury attorney not a divorce attorney. The action was filed with no foundation basing the action on hearsay only. No hearings occurred and no court orders were obtained. An employee of the Court Ordered Benefits Branch at the Office of Personnel Management in Washington, D.C. named David Shelley was contacted by this attorney. The defendant James J. Carroll, Jr. with counsel misinformed the employee that the garnished postal pension would be likely recovered. Federal Law 42 U.S.C. Title V 651-659 et sec. and case law such as Hobbs vs. OPM prohibited any legal process, and or return of the pension to the original pensioner once garnished for alimony debt, so these claims were unfounded and a rouse for fraud. The OPM employee stopped all payments without a court order. Josephine Carroll contacted OPM who instructed her to go to court without giving her notice or due process and again depriving her of all guaranteed rights under the law. The Honorable Justice Rockett of Middlesex Family Probate Court restored the alimony per divorce decree and sanctioned the attorney verbally, but not the defendant who was in contempt of court and should have been jailed.

A. Josephine Carroll suffered out of pocket loss for retaining counsel and was never compensated although terms of the divorce provided for this recovery.

XXXVIII On or about October 20, 1990, without warning, the defendant James J. Carroll, Jr. filed a Lowell Superior Court suit as CA 90-6857, relitigating pre-divorce issues and other claims where he was the proximate cause. [This is the initial action on which the defendant and his counsel have based all of their compilations of fraud and abuse to defeat titles regardless of how held, to defeat divorce awards, to defeat Federal Law, to conduct a crime wave and to make a literally mockery out of the entire legal process to ultimately injure the plaintiffs and unjustly enrich themselves wiping out a life of work and sweat equity and to essentially get all assets awarded to Josephine Carroll and any assets the son or any other party held in the process. [This was the original goal from the divorce forward.]

By law, one can not file suit against another for issues on which they are the proximate cause.

One can not get commonsense decisions, remedies or guaranteed rights and the law to work as it

was intended with many saboteurs and predetermined actions. [Emphasis] Massachusetts law

prohibits false witness and the false filing of suits with the sole intention to defraud another. No

service was ever made a requirement of due process.

Department of Justice attorneys agreed all actions were to stop with the divorce as the final

decision that cut through all law and as a determining decision and any change could

only occur through an action and decision on matters emminating from Probate Court, not any

other court and the divorce decree had long been finalized. The defendant James J. Carroll, Jr.

had appealed the divorce prior to this suit and was denied. The basis of the claims in the alleged

civil suit derived from previously settled divorce issues and a break and entry by the defendant

James J. Carroll, Jr. on or about February 1988 at the start of divorce proceedings whereby the

defendant defied two restraining orders. The claims were already adjudicated, past appeals and

past statutes of limitations and predivorce issues could not be heard in Superior Court unless

complex litigation procedures employing the appointment of a Probate Judge in Superior Court

session occurred with transfer to Probate which again did not occur. [Emphasis] These matters by

law could only be litigated as an issue of fraud or a Valid Modification in Probate Court and did

not proceed as such in Probate making the post divorce litigation void by Operation of Law.

The venue sought was oddly, a Northern Middlesex County Court and not a Southern Middlesex

County Court whereby a Northern Middlesex County Court could not serve the parties by

juristictional rules. Once again this was void by Operation of law. (No juristiction)

See the Massachusetts Lawyer's Diary for confirmation. This is why Lowell has a separate

District Court, Lawrence a separate District Court and Cambridge a separate District Court as

well as many others for other juristictions. The courts are organized by counties.

61

the main defendants, the crux of that civil case as Bedford Police and the Eliot Community
Mental Health "not at fault". [Emphasis] If the main defendants on which all claims are based are
found not at fault, then no one else related to the same claims can be at fault, added to the facts
that it was the wrong juristiction, no basis for suit and no service.

A. On or about November 11, 1993 the Superior Court civil action 90-6857 was remanded to the
Lowell District Court because the facts were seen as "poor on the merits with an unlikelihood of
recovery ," a reason or remand. Such cases are sent to a District Court for disposal. [Emphasis]
Normally cases are limited to $25,000.00 in damages under statute and plead to nominal
damages and or dismissed.

B. Later discovery demonstrated that the remanded case in Lowell District Court 93RM96 was
dismissed on time standards making it a dead case well before any alleged judgement.

C. The entry and this document were removed from the docket and the docket coversheet altered
to hide this entry. No service was rendered in the remanded case. The entry was replaced by
correction fluid with notices sent in handwriting. All other entries were typed.

D. On or about August 25, 1994, the record claimed to allow a judgement far beyond statutory
cap limits of $25,000.00 and the allowable limit under District Court rule 9. The subject matter
was sole juristiction of Superior and could not be heard as to the merits in a District Court.
E. No Show Cause hearings were made [Emphasis] to determine damages at either level,
emphasizing fraud. No accounting of assets and no determination as to satisfaction.
Said judgement was entered by "default" on or about August 24, 1994 by justice Barbara Savitt
Pearson, a Lawrence District Court Judge who regularly sat in Essex County.[Emphasis]
Later facts revealed an unsavory picture involving this judge in a set up and conspiracy to
embezzle and defraud the plaintiffs and the U.S. Government all based on this alleged judgement
found to be fabricated and riddled with fraud.

62

XXXIX F. The defendant listed in these civil actions was Josephine Carroll and James J. Carroll, III who were never given their day in court, nor tried before a jury of their peers, nor facing their accusor in court denying due process of law. The claims of the defendant were pure hearsay with no substantiation and neither Josephine Carroll, nor James J. Carroll, III would have attempted to place James J. Carroll, Jr. in a mental institution when Josephine Carroll was dependant on alimony from James J. Carroll, Jr. and the onus for maintaining Josephine Carroll had fallen upon James J. Carroll, III. Attorneys as ex-prosecutors of Southern Middlesex County in private practice advised Josephine Carroll that quote, "They would be laughed out of court with such a case and the case was a sham to walk away." The attorneys stated, that Josephine Carroll was divorced, an indigent person uncollectable by law and the alleged action was unenforceable by law and court rules.

G. The alleged Lowell Judgement from Lowell District Court in case 93Rm95 was then used in Probate Court against court rules, against the law and contrary to contempts. Foreign civil judgements and related claims must be settled in the court derived and can not be used in Probate Court, a court of Original Juristiction, an independant civil court which was to uphold preexisting orders in case 86D 1651 which instead were ignored. The foregoing actions were used "to attach" the basic alimony funds derived from Office of Personnel Management by Court Order of Justice Beverly Boorstein at Middlesex Probate Court Cambridge on or about June 1, 1995.

H. By Federal Law and State Law these funds were free of all [Emphasis] legal process. Basic Alimony funds were derived through a garnishment order from the divorce decree whereby payment was sent from the U.S. Treasury. These payments were held in escrow by Probate Court on pure fraud and misuse of the system and their (abuse of power) sending payments to the Chief Probation Officer Brendan Callanan, initially for 3 years from June 1, 1995 through June 28, 1998, while Josephine Carroll was deprived of her rights and made destitute contrary to Massachusetts Law and her Federally secured Rights.

63.

XXXIX I. Both federal law under 42 U.S.C. Title V and state law under M.G.L chapter 208

section 34 along with other statutes prohibited these acts. Under Massachusetts law a divorced

spouse to whom alimony, support or maintainence is owed is supposed to be maintained in the

same standard of living they were accustomed to during the course of the marriage. By law no

justice can alter, amend, lessen or eliminate such an order if it will place the recipient on the

public dole which was what the Commonwealth and the defendants did to Josephine Carroll.

J. Justice Boorstein overstepped Federal Law using her judicial powers to aid James J. Carroll,

Jr. and his counselors in crimes (battery) which can be mental and physical and financial against

an elderly person denying an entitlement by law. This can be seen as discrimination, gender bias,

elder abuse and a felony assault on a person over age 60, a felony under both Federal and State

law and abuse under provisions of VAWA. These actions are an abuse of power, bias as well as

a financial crimes of embezzlement, strong arming, coersion, not to mention crimes against the

U.S. Government as no state court can overstep Federal Law which is supreme over state law.

(Recovery can be made under the False Claims Act.)


K. Justice Boorstein had accepted an unproven alleged Lowell District Court judgement from a

foreign subservient court with different rules which could not be used in a Probate Court, a

foreign juristiction ; uncertified documents and actions which could not be

entertained in Probate Court by Court rules aiding combative individuals, the defendants

collectively to deprive both plaintiffs of their Constitutional and Civil Rights under law.

L. An attorney for Cambridge and Somerville Legal Services advised the court that these actions

were prohibited by law, but Justice Boorstein refused to listen.

Probate Court is a court of Original Juristiction which overrules and oversees all other state

courts with exception to the Supreme Judicial Court. Probate Court decisions cut through all law

pertaining to a divorce and divorce orders supercede any other action that follows it unless

changed by an Amended decree and extenuating change in circumstance.

64.

M. Contempts come before modifications and modifications can only be heard if extraordinary changes in circumstances occurred such as death, disability or loss of employment, none of which was applicable. Fraud and criminal abuse is not allowed to be upheld by law nor supercede valid rights, valid law and valid actions.

Justice Boorstein accepted an affidavit claiming service from a former process server to then secure the escrow order when service was never made.

N. Investigation proved after contact with Sheriff Bailey and the Office of the Secretary of State for Massachusetts that this individual was posing as a process server and was not employed in any capacity for the Commonwealth of Massachusetts at the time he alleged he made service.

O. It is a crime under Massachusetts law to pose as a court officer or law enforcement officer.

P. The affidavit was proven to be equally bogus with perjured statements which were disproven with contradictory letters from NYNEX as the alleged process server claimed to verify residency by calling directory assistance when the telephone at the residence of Josephine Carroll was a number that was unlisted and such information is not given by NYNEX now Verizon by directory assistance. (This fraud was only a small part of a scam to defraud and place the victims through false litigation, a trick to deceive and convert assets.)

Q. Justice Boorstein was later removed from the bench for fraud upon the Commonwealth after a Channel 4 Eyeteam exposition.

R. The U.S. Treasury funds "free of all legal process" were diverted to an escrow account, a form of money laundering placing the account under the name of the defendant James J. Carroll, Jr. who legally had lost all rights to the postal pension once garnished with exception of tax deductions. This should be seen as a form of mail fraud and embezzlement on total fraud with abuse of process as well as a crime of fraud on the Federal Government by James J. Carroll, Jr. his counselors and agents, especially since the alleged judgement used to defeat Federal and State Law was proven to be fraudulently procured. It is a crime to make a false statement to the Federal Government, any agency or branch thereof.

65

XXXIX S. On or about June 28, 1998, Josephine Carroll, the plaintiff, had obtained a letter from

the honorable Senator Edward Kennedy and counsel for OPM, Murray Meeker explaining that

the funds from Postal Pension, CSA number 3005275 once garnished were free from all legal

process. This evidence was presented to Probate Court whereby justice William Hygas, Jr.

released the funds held in escrow. OPM failing to realize that the divorce awards never changed

thereby asked for an order specifying an apportionment on which to pay Josephine M. Carroll

receiving the order of Probate Court on September 1, 1998. OPM refused to obey the Probate

order on the foregoing basis.

T. The attorneys for the defendant James J. Carroll, Jr. continued their unlawful campaign,

appealing the Probate decision of release of escrow, receiving a denial and then enlisting the

the aid of the Chief Probation Officer Brendan Callanan, a court officer from Belmont where

attorney Gahan lived to assist them in the embezzlement, conversion and obstruction scheme.

U. Court officers by court rules and ethics law can not become personally involved in any case

before the courts, defy court orders or assist in any way to break the law, use unlawful force

against a party or conceal and obstruct the delivery of lawful assets to them. No court officer is

allowed to aid in fraud, abuse or receive anything of value, favor or gratuity to assist in any way

to sway or throw a case in any direction, as this behavior is a conflict of interest and against

ethics rules, and the law.

V. On or about June 1998, covertly and without notice to Josephine Carroll, with the express

intent to set up Josephine Carroll and deny her due process of law, the defendant James J.

Carroll, Jr. with counsel filed a case before the honorable Regina Quinlan in Lowell Superior

Court falsifying service and misleading her honor into believing the Probate escrow account was

a mere bank account to attach on an alleged Lowell District Court judgement previously proven

as fraud and voided by a Superior Court Injunction. Her honor not knowing the complete facts

on a one sided exparte hearing allowed an attachment of the account defeating the Probate Court

Order of Release of escrow, again on fraud.

66.

in Cambridge Superior Court in case CA 98-2825 whereby she ruled that the attorneys

and James J. Carroll, Jr. had committed felony fraud on Superior Court and were in

Contempt of Court on a Superior Court Permanent Injunction as well as orders of Probate Court.

Her honor found that the attorneys and the Chief Probation Officer with the East Cambridge

Savings Bank conspired to defraud Josephine Carroll and the Federal Government. The Chief

Probation Officer had refused to release the funds, made himself unavailable and delayed and

denied receipt of the released funds while he arranged with the bank to convert the accumulated

funds to a check form held in the bank vault for easy access while the attorneys mislead Justice

Quinlan. The bank refused to Obey the Permanent Injunction as did the attorneys and the Chief

Probation Officer who were all served with certified orders. Clearly this was conspiracy to

defraud with the use of the powers of the Massachusetts Courts and individuals employed by the

Commonwealth of Massachusetts overstepping their authority for criminal gain. Justice Quinlan

ruled with prejudice that the defendant James J. Carroll, Jr. and his counselors had committed

Felony Fraud on the Superior Court, used selected facts to mislead the court and usurp Federal

Law as well as caused the court to exercise juristiction where it lacked as well as interfered with

the pendancy of a Probate Court Order of Release which would have returned the accumulated

Treasury funds to Josephine Carroll. Her honor also found that the defendant James J. Carroll,

Jr. with his counsel had committed a Contempt of Court on the Superior Court regarding the

Permanent Injunction which was violated and with regards to the Probate Court order. Her honor

severely chastized the attorneys sending a hand written complaint for misconduct to the Board of

Bar of Overseers for disbarment and a complaint to the District Attorney for Felony Fraud and

other criminal acts.

X. Justice Quinlan never imposed the mandatory jail sentence of one year for contempt on the

Permanent Injunction from CA 95-6545, although this is believed to be an oversight.

67

XXXIX Y. The attorneys apparently contacted a clerk who altered the record making an appearance of an apology one month later with nonsensical rhetoric [Medical jargon not legal terminology] when her honor was definitely not going to reverse her decision. The complaints were never mailed when complaints are issued the same day. Both recipients confirmed that no such complaint had been received by them. This is continued fraud on the court with insiders. [Emphasis] The attorneys returned to Probate Court for another round of fraud and abuse Please continue with October 7, 1998 for next event in sequential order.

## Basis For Injunction

27. On or about November 8, 1995 concurrent with the Probate actions aforementioned, the plaintiffs Josephine Carroll and James J. Carroll, III petitioned the Cambridge Superior Court in CA 95-6545 requesting injunctive relief. The ongoing abuses through misuse of the system were presented to the court. The honorable Henry Smith entered a Preliminary Injunction on this date noting the continual setups, fraud, false complaints, Staging and fabricated documents and actions with many crimes not addressed by any level of the authorities. The order prohibited no contact of any type, no interference with liberties, property rights, no theft or vandalism. James J. Carroll, Jr. his counselors agents and third persons were enjoined by this order.

A. The Injunctive case continued. The plaintiffs Josephine Carroll and James J. Carroll, III won the case after proving the networking and many abuses which would be overwhelming to elaborate to this court. As a brief example of some of the conduct, mail was stolen and tampered with repeatedly by the defendant as well as unsolicited mailings with invoices for payment sent by him causing postal inspectors to stop all mail to Josephine Carroll. The defendant James J. Carroll, Jr. was formerly prosecuted by the U.S. Postal Service for harassing a postal supervisor and literally without exaggeration sending freight trucks full of unsolicited mailings. One of the events highlighted to secure the injunction was that on September 18, 1995, James J. Carroll, III son of the parties and plaintiff was harassed at his employer after defendant Robert A. Costantino, counsel for the defendant James J. Carroll, Jr. arranged with justice Barbara Pearson

68

209A criminal restraining order against James J. Carroll, III and Josephine Carroll without hearing, without notice and without cause. Justice Pearson had been formerly reprimanded by Justice Zoll and the Commission on Judicial Conduct for doing this before to James J. Carroll, III after making the courts aware of the conduct of James J. Carroll, Jr. proven to be misusing the attainment of restraining orders.

B. The unfounded restraining order on or about March 5, 1995 was used to stage a violation on a proven falsified police report a crime. [Emphasis] The District Attorney did not prosecute the defendant James J. Carroll, Jr. or defendant Robert A. Costantino who was operating false actions for defendant John A. Gahan III and the defendants of the Town of Arlington collectively.

C. The Middlesex District Attorney was used with Arlington Police to apprehend and seize James J. Carroll, III on an alleged violation with an unserved restraining order, a legal requirement of due process. In Concord Court before justice Paul McGill, after Channel 5 began investigating, the case was dismissed and attorney Costantino testified to the court that James J. Carroll, III was arrested for quote, "His civil default judgement" unquote, [Emphasis] referencing the arranged judgement in Lowell District Court 93RM95, again through justice Pearson which would have no connection to restraining orders served or unserved. This was an admission of essentially staged proceedings to kidnap, incarcerate and libel - slander, defame and malign the character of James J. Carroll, III as well as cause him extreme emotional distress and remove him from any assistance to his medically ill mother so that ultimately attacks against her could be successful. This again is criminal stalking, criminal harassment, entrapment, kidnapping, and deprivation of civil and Constitutional Rights. All are felonies under state law as well as prohibited by Federal law.

69.

D. Through discovery, facts were found that attorney Costantino contacted Department of Revenue and obtained tax information from a Federal Employer of James J. Carroll, III , sent a subpoena to the employer 28 days after start of employment, gave the information to his client the defendant and together false complaints were delivered to Sargeant David McNamee of Arlington Police who arranged events with a false stop without probable cause of James J. Carroll, III and an unlawful detainment as well as false arrest and harassment at the employer with derrogatory unfounded malicious complaints which were ultimately dismissed. These actions occurred with the cooperation of several Waltham Police Officers causing so much disruption at the employer as well as interfering with an employment relationship that the Human Resources Director made a formal complaint to the Mayor of Waltham. Waltham Police admitted that Sargeant McNamee communicated with them.

28. Defendant Arlington Police Sargeant McNamee, the defendant has aided in many controversies which the court will learn.

29. In the permanent injunction these facts and other issues including the fraud in the alleged Lowell District Court judgement by default were exposed. Investigation began to demonstrate relationships and connections between players in a constant effort to drive the plaintiffs from their home and overwhelm them by any means possible especially financially.

30. On or about July 2, 1997, the Preliminary Injunction progressed to a hearing for permanent injunction where the honorable Hilliar Zobel a former divorce attorney and law professor entered a "no contact order" [Emphasis] and ordered permanent separation of the parties incorporating the former orders of no interference with liberties, no interference with property rights, no theft or vandalism or communication of any type which included third persons. Justice Zobel was presented the many abusive events and shown the alleged Lowell District Court judgement. Two court clerks insisted that Justice Pearson as a visiting judge never sat in Lowell and requested a complaint be mailed to Justice Melahn the regularly sitting justice. Justice Melahn was previously petitioned to remove a default on what was believed to be a valid case which he

$7o.$

30 cont'd. promptly removed, but his decision was withheld, the docket falsified to make an

appearance of a second hearing and a second hearing for removal of a default [already removed

from the regularly sitting judge who would handle all matters in his court.]

was heard with justice Pearson. Lowell cases are never taken across counties into a Lawrence

District Court which is not allowed by law or court rules. Justice Pearson asked non sensical

questions and claimed she would not remove the default to deceive and allow the continuation of

fraud and crime under color of law. There were many other issues of fraud and relationships

discovered.    Justice Zobel severely chastized attorney Costantino calling him and his client,

James J. Carroll, Jr. and their cohorts quote, "gorrillas and guerrillas" unquote.[Emphasis]

His honor asked counsel for the plaintiffs Josephine Carroll and James J. Carroll, III why the

defendants were not crminally prosecuted. The most concise answer is one can not get justice in

kangaroo courts where relationships overstep and obstruct true law. In this case there are many

relationships and a long list of excuses for culpability.

31. Due to networking, any judge with integrity has been bypassed to network and to allow the

agenda to continue. The evidence demonstrates the truth by "preponderance of the evidence".

The court should note that the end result does not justify the means.

Once the case Permanent Injunctive case concluded, the defendant and his counsel snubbed the

order in defiance and continued their course in other courts continuing what can be shown as

networking with total fraud. Josephine Carroll stripped of all funds could not retain counsel

for defense, nor could legal services handle the complexities that continued unabated.

A. Once this Permanent Injunctive order entered, orders from the lower court District Court

regardless of merit were voided and stricken and any litigation [Emphasis] could not progress

without leave of Superior Court in this case specifically. Upheld all issues, titles and awards as

they stood at conclusion of divorce. The defendant, his counselors and agents and third persons,

were permanently restrained whereby none of the actions which followed were legally justified or

allowed by law.

32. Following the foregoing orders of Justice Quinlan in Superior Court case 98-2825 on August

8, 1998, the attorneys returned to Probate Court oddly returning to Justice William Hygas, Jr.

who was fully apprised of events in Superior Court with court certified orders.

His honor previously created the order of release of the escrowed alimony which the attorneys

attempted to defeat but this did not raise any concern for his honor. The same subject matter

prohibited by court rules and doctrines of res-judicata, clean hands, promissory and collateral

estoppel was retried which is a similar issue to double jeopardy. His honor unlawfully

entertained a Modification with voided subject matter, foreign subject matter and entertained a

Modification with falsified service, ignoring Contempts which come before Modifications. These

facts were confirmed with staff attorneys for administration for the Probate Court calling the

actions illegal.

33. On or about October 7, 1998, the Chief Probation Officer Brendan Callanan of Belmont was

used to testify before the court with perjured testimony that Josephine Carroll told him she was

ill and that was why she was not present. No such conversation occurred. Court Officers may not

testify or become personally involved in private cases as this is conflict of interest prohibited by

law and court rules. A guardian ad litem was thereby appointed without medical certification or

grounds as required by statute. The guardian by state law must be paid by the Commonwealth

in an amount of $17.00 to $50.00 per hour subject to discretion of the court. A 20 hour maximum

is imposed by law. The guardian, a Charlene Philbrick of Chelmsford was informed she was not

wanted ; was acting on fraud and was to withdraw per Josephine Carroll, per her physician and

per James J. Carroll, III who held a superior right with a revocable power of attorney which could

be envoked by discretion of Josephine Carroll who held full capacity confirmed by her physician.

Contests were made to the court by the plaintiffs and Dr. David Khoury. The guardian was kept

on the case for a full 90 days as if Charlene Philbrick was a guardian for a medically certified

person, totally incapacitated person, minor child, retarded person or ward of the state. None of

this legally applied.[Emphasis]

7ð

34. This action prevented Josephine Carroll from exercising her lawful rights, such as freedom of choice, freedom of movement and to exercise one's rights under the law, due process, equal access and equal protections in a court of law and from having standing, from having choice of counsel and from proper defense where the opposition obtained an unfair advantage using financial battery and exploitation of an elderly person as well as that of the Federal Government again tampering with funds free of all legal process.

35. On or about October 24, 1998, at least $7,000.00 of the U.S. Treasury funds from CSA 3005275 decreed to Josephine Carroll as basic alimony in the divorce decree which never changed, already said to be released by Probate Court Order remained in possession of the Chief Probation Officer of Probate who refused to release the funds or account for these funds. The Department of Corrections who oversees this Probation Officer refused to take action. $2400.00 of these non attachable funds free of all legal process were awarded to Charlene Philbrick as counsel fees. This is fraud against the U.S. Government, as the funds are U.S. Treasury funds until delivered to Josephine Carroll and funds were diverted on fraud. Under U.S. Federal law once funds are garnished for alimony debt they can not be returned to the original pensioner nor can they be regarnished or reapportioned, attached or placed under any legal process. [Emphasis]   Discussion with Treasury agents agreed that these facts on their face appear as a theft. Attorney Philbrick overstepped the rights of Josephine Carroll with Robert Costantino and James J. Carroll, Jr. creating an illegal search and seizure of a person and property.

36. Law enforcement within the Office of the Attorney General's Criminal Bureau agreed that this was an illegal act to take control over an estate and to strip a person of their rights and control. Superiors in that office have refused to address issues of crime and public integrity calling it a civil matter and a private issue when this activity has also been used against other citizens. The F.B.I. has insisted that the Office of the Attorney General address the issues.

each were to uphold the orders of the other, but since covert agendas were being operated behind the scenes, nothing would stop the intended injuries for the enrichment of those who stood to benefit undermining and stripping the plaintiffs of their rights both jointly and severally. 36. The Probate Court created new orders through Justice Hygas to reescrow the basic alimony funds derived through the Office of Personnel Management holding funds from June 1998 through October 1999, a year later with no accounting or answer as to disposition.

37. Throughout 1999, the defendant James J. Carroll, Jr. with counsel claimed to petition the honorable Judith Dilday at Probate Court again without notice to Josephine Carroll sending mail to bad addresses and falsifying service for an unfair advantage. When attempting access to redress the court, Josephine Carroll and her son James met obstructions by clerks who made briefs disappear, blatantly made an issue about filing motions and openly contacted clerks on the telephone to stop any redress before justices. This sabotage continued in too many ways to elaborate at this juncture.

38. A David Shelley from Court Ordered Benefits Branch at OPM began calls to Josephine Carroll insisting that she pay for her health insurance admonishing her for James J. Carroll, Jr. having a family plan. Josephine Carroll informed David Shelley that as legal strangers she had no connection to the affairs of her exspouse and he should address it with him. By law, under M.G.L. chapter 208 section 34 and the divorce decree, the defendant, James J. Carroll, Jr. was to maintain health insurance for Josephine Carroll and was not to do anything to diminish an alimony order to provide it. Josephine Carroll informed David Shelley of these facts, but David Shelley insisted a biased position towards James J. Carroll, Jr. as if he had a personal interest.

39. Concurrently, James J. Carroll, Jr. alleged that he obtained an order ex-parte to eliminate all alimony debt when Massachusetts law makes alimony debt non extinquishable (See Mass. Practice Inca on divorce.) In the alleged order of Justice Dilday, the order directed Office of Personnel Management herein after OPM to pay health insurance altering and amending an entitlement free of all legal process. OPM had received the Permanent Injunction which they too were to follow with a new certified copy of the original divorce decree and amended decree. OPM received the alleged order found falsified where contradictory evidence was found emphasizing fraud and although OPM was given proof of the fraud, OPM usurped Federal and State law, overstepped a divorce decree and obeyed a void order stripping the plaintiff Josephine Carroll of all rights and subsistance. OPM ignored the prohibitions from the Permanent Injunction, as well as Federal law and accepted the alleged Probate Order of Judge Dilday dated October 1999 when they knew the defendant legally lost all rights to the pension through divorce. OPM never received an amended divorce decree which would be necessary for them to implement any change.

A. OPM would not obey the Probate orders dated June 27, 1998, originally restoring payments to Josephine Carroll on September 1, 1998 claiming they needed an order specifying an amount in which to apportion, but instead, accepted an order from a disgruntled ex-spouse contrary to law which lacked the same, thereby nullifying all preexisting orders and awards. OPM altered entitlements paying alimony payments to instead pay health insurance, an obligation of the defendant James J. Carroll, Jr, under the decree and the law and eliminated all basic subsistance, placing her health, welfare and any ability to secure counsel in jeopardy as well as everything she had maintained and worked for in her life. Under Federal Law this could be viewed as licensed domestic abuse, elder abuse, denial of human rights and gender bias a violation of VAWA. OPM would not address the issues only stating we need a new court order.

39 A. Fraud does not bind the victim only those who rely upon it. This was conversion were OPM and the GAO had little concern over fraud perpetrated against it. Investigation into the docket produced an entirely different order which mimicked the one sent by James J. Carroll, Jr. but indicated denied. Justice Dilday also confirmed that she does not entertain ex-parte hearings nor was ever assigned to that session, emphasizing fraud.

B. Again, this is a crime against the plaintiffs and the U.S. Government.

C. OPM suddenly eliminated the divorce decree per their admission in the Court Ordered Benefits Section to cover for their misdeeds thereby claiming no such order existed on file when OPM was originally paying Josephine Carroll through the divorce decree qualified domestic relations order which they must follow.

D. OPM then asserted that the pension belonged to James J. Carroll, Jr. and claimed that they had to follow the Privacy Act of 1987. OPM refused to give any records on the pension. OPM then claimed they had no divorce decree or order on which to apportion for Josephine Carroll. Inquiries to other departments contradicted these claims.

Complaints to all levels including Congressional inquiries received this one response or went unanswered. These issues strongly conflict with the provisions of VAWA.

For an elderly person to be deprived of all subsistance who must remain free of stress and anxiety with a heart condition, this was a certain death sentence. The court should note that this has been an ongoing goal of the defendant James J. Carroll, Jr. made more attainable others for greed and self serving agendas where all have a monetary motive.

E. Attempts to address these issues in Probate Court continued to be met with obstructions due to Assistant Registrar Gardin of Arlington [the same town where the plaintiffs resided] and justice Boorstein [until her removal from the bench] who refused to give Josephine Carroll any standing or equitable relief. Assistant Registrar Gardin was one of the vocal individuals who

unexplainedly intervened in a private case and had sealed a bogus court order when seals are normally applied in the divorce department of the court.

39 F. Unable to obtain relief, Josephine Carroll contacted many attorneys, the Attorney General and Legal Services. A paralegal from Legal Services called Josephine Carroll screaming at her that she did not qualify. Upon inquiry, the Supervisor stated the paralegal was wrong and that she found a letter in the divorce docket which the attorneys prepared claiming that Josephine Carroll had enough money to buy a condo in Florida and that was where she should live.

G. The Supervisor quickly realized that these funds were for 3 years of basic alimony already due for sizeable debt in that period. The Supervisor agreed Josephine Carroll qualified, but added the case was beyond their resources and expertise and each agency agreed that too much occurred that was making the case unruly and too difficult to maintain since the law was not upheld.

H. Once successful in eliminating all income and legal relief to Josephine Carroll, essentially holding her hostage to the embezzlement, conversion and theft plot of the defendants collectively, the defendants Robert Costantino, James J. Carroll, Jr. and later John A. Gahan, III, with Thomas Vangel partner proceeded to Land Court. It is illegal for either spouse to interfere with the estate of the other once divorced and an amended decree in Probate is the only means that this can occur. That requirement never happened. [Emphasis].

H. At Land Court, the Chief Title Examiner reviewed chain of title on Registered Land Titles held by Josephine Carroll. Contractual basis and law prohibited reversion of assets to Josephine Carroll and by law the true title holders of the property were never enjoined to any controversy or subject to legal detriment in Land Court or any other court, emphasizing fraud and void actions. Therefore, the court lacked subject matter juristiction and all that followed was again void by operation of law and was based on pure fraud and a void legally void fabricated judgement.

39 I. The Chief Title Examiner stated that she did not find any fraudulent conveyance as alleged by the defendant Robert Costantino. By law findings and the report of the Chief Title Examiner must be followed by the Court. The court may only look to chain of title in succession and is to defend title to be free of adverse claims of right, adverse possession and clouds on title which also relate to civil and criminal trespasses, torts against persons and property as well as title which can be a libel as well as defense of the peaceful and quiet enjoyment of one's property.

J. Although Josephine Carroll was only a holder of title, the true owners of the property were not enjoined in Land Court. Land Court is to recognize both Probate Court decrees and Superior Court Orders which were ignored to operate crime and coverup. Essentially any tampering with title is nothing more than false papers that hold no legal weight, but are unlawfully upheld over valid rights of the true owners.

K. By law, the Attorney General of Massachusetts holds a security fund to defend titles against fraud and loss. Although contests involving the foregoing issues were raised before the Land Court, the issues were all ignored, contests sidestepped and blocked by clerks and Chief Justice Peter Kilborn who agreed that his actions with the underlying facts would be a nullity by law, refused to rule as such creating an adverse possession and cloud on title reviving proven forged deeds previously voided which broke a chain and connected to the defendant James J. Carroll, Jr. and his counsel. The court should note that the defendant and his counsel were not part of the deeds.

L. Deeds proven forged and voided 13 years earlier were revived never allowed by law, usurping valid titles that followed in a chain. The Commonwealth through intentional injury and abuse of power created a false title making a cloud on title. Deeds once voided are never revived by law, so the actions were all legally void. On this newly created deed by the Land Court, a sheriff sale was created with the aid of deputy sheriffs Donnelly, Breen, Deyoung and Faye who later

78

physically assaulted the plaintiffs, robbed their home and made them homeless and assetless. Lawyers asked if the sheriff sale was a fire sale, as they never had seen any property valued over $1 million dollars taken for $10,000.00, emphasizing this was fraud and abuse of power. 39 M. Complaints to the District Attorney, the Attorney General, the Inspector General and the police, the Probate Court were all ignored, contrary to statements of clerks in other counties and N. District Attorneys in other Counties stated, it was an obligation [Emphasis] of the District Attorney in Southern Middlesex to address the issues when losses exceeded $250.00 and in this case losses were in fact the millions of dollars. It was also emphasized that the crimes were felonious and heinous and an issue of public integrity and were no longer "a private issue, but a crime against the Commonwealth".

O. A certified handwriting expert certified in Massachusetts and New Hampshire was retained to prove that the deeds which were revived contrary to law were in fact forged. The expert proved that transposition forgeries occurred from unauthorized parties, a crime, but all ignored these issues.

P. The defendant Robert Costantino proceeded to falsify documents and attempted to threaten, mislead and intimidate the expert. Although this is a state issue and grounds for a mistrial in a legal case when valid, this emphasizes conduct to insure an unlawful victory on fraud and crime. This is a crime and grounds to dismiss a case for witness tampering.

The witness complained to the court who ignored the complaints. This is only one issue of a that is a foundation as a violation of 42 U.S.C. s 1983.

Q. Written Complaint was filed with the Commission on Judicial Conduct whose attorneys agreed that Justice Kilborn made a quote, "grave error", unquote. Evidence of Payola was found to the Office of the Middlesex Sheriff was found, and more facts demonstrating falsified, maintained documents with staged cases built on total fraud.

79

39 R. Attorneys who viewed the facts stated the succession of fabricated cases were entirely illegal, where one attorney emphasized a successive Land Court case could not be built as had occurred without a final order in the initial case upon which it was built. A litigant can not appeal a faulty record which is continually falsely revised and is based on total fraud. Appeals are for error of law, not error of fact.

S. On the alleged Land Court case, a staged hearing without notice to seek possession was devised under Land Lord Tenant in Cambridge District Court. Again a void action in the law without meeting due process requirements and fabricated on legally void grounds remains void by operation of law and instead becomes a crime.

There was never any Land Lord Tenant relationship which would require a contract and offer and acceptance. No such contract was ever presented to District Court and no such relationship exists 13 years after a divorce between divorced parties. This is a contempt of the divorce award in Probate Court and a contempt  The of the Superior Court Permanent Injunction.

The defendant Costantino and his client the defendant James J. Carroll attempted to shake down the plaintiff Josephine Carroll, demanding $10,000.00 to stop the alleged sheriff sale as well as over $ 1 million dollar demands from the Office of the Middlesex Sheriff to extort followed when the defendant James J. Carroll, Jr. already owed the plaintiff over one million dollars of non extinquishable alimony debt.

39 T. (Evidence can be shown that this is pattern and practice.) Again contests in District Court were ignored on onesided predecided actions where evidence again shows an exchange of relationships and connections. The judge used, was both formerly in the lawfirm of the divorce trial judge who was thrown off the bench on fraud and abuse of power and the judge used resided in Belmont where attorney Gahan and many other conspirators resided who worked with attorney Costantino in this scheme. In a staged hearing for possession based on the foregoing

fraud, disinterested bystanders as litigants in their own cases questioned what they witnessed, noting that the District Court judge would only accept hearsay from Robert Costantino and James J. Carroll, Jr. and would not take evidence and testimony in behalf of Josephine Carroll or any other related party. No District Court can nullify terms of a divorce decree or of parties not subject to suit or levy nor open the door for successive crimes including the licensing of domestic abuse, domestic terrorism, robbery, conversion, credit card fraud, assault and battery, kidnapping, public records fraud, identity fraud or auto theft. This is an overview of a long list of other crimes not to mention torts. In other prior matters, this very same judge had passed actions over to the Probate Court admitting he lacked juristiction and would be operating outside the scope of his authority, yet he overstepped the orders of both Superior Court and Probate Court and the law with these bogus actions based on the fraud created with the Lowell District Court, an entirely different District Court and different juristiction with an unproven uncertified alleged judgement by default used as a basis for all controversies ignoring the Superior Court Permanent Injunction which prohibited all of this frivolous and meritless staged litigation to cover crime. Again, no leave of Superior Court was obtained, required to exercise any action which conflicted and or defied the existing Injunction. (Please refer to the Permanent Injunction which was to stop this abuse.) Restraining order requests by Josephine Carroll were ignored with threatening letters clearly written by the defendant James J. Carroll, Jr. Massachusetts Law requires an individual seeking protection only to be in fear for their safety. This fact was made clear and the issues of abuse were made clear to the court, but Josephine Carroll was denied any protection as required by law.

40. An eviction was staged [Emphasis] thereafter culminating in events on or about February 20, 2002, whereby a stay was obtained although all was contested. The court must note that the plaintiffs have exercised their rights to maintain them and betrayal can not be bypassed and conspiracy can not be stopped until the truth prevails and the culprits are prosecuted. When the attorney withdrew for Josephine Carroll claims were made without notice, that the court changed the decision sua sponte which denied due process and equal access as well as equal protection by the courts and or a trial by jury of one's peers. No notice or service was given for these alleged decision.

When the facts were learned far after the fact, any attempt to clarify, prove the validity or invalidity thereof was blocked by clerks who made various excuses and clearly had a tone of hostility, making an appearance of a vested interest. Although the number of individuals involved sounds incomprehensible, this has been confirmed by many attorneys who investigated and stated it was fact. Attorneys noting all of this networking voice their reservations for entering such a case.

A. On or about February 20, 2002, Arlington Police officers and several others appeared by surprise at the back door of 7 Oldham Road Arlington, the residence of Josephine Carroll at approximately 10:00 a.m. Officer Hughes directed by Sargeant McNamee used a battering ram and a shod foot to break down a french door off the hindges and frame after forcibly breaking two storm doors. No warrants or legal right was obtained to gain entry therefore, the actions were criminal and were a break and entry in the daytime, an armed robbery and assault. All are crimes under law and police abuse with excessive force followed. Outside the home was the exspouse James J. Carroll, Jr. who videotaped the assault. The guise of the entry was an eviction. Police by law can not process evictions and are prohibited from such acts by law. Forcible entry is not allowed in evictions and no eviction process could apply to the premises by law. Excessive force,

40 A. Cont'd  kidnapping and battery followed as well as many privacy invasions as the plaintiffs

were forced out of their home while the home was ransacked. [Emphasis]

A Gerald Loomis, a Weymouth Constable, who is from the area where the defendant

Costantino resides, entered the home with a Constable Boyle, Officer Greely, Officer Powers,

Officer Flynn and several unidentified officers. Officer Hughes, when asked his name, falsely

identified himself as "Officer Beauchois". Officer Beauchois was not present and not involved

in the incident.[Emphasis]  The We Haul Movers, a notorious unsavory company under

investigation by the Office of the Attorney General of Massachusetts arrived at the home with

trailers threatening that if they were not paid $5,000.00 on the spot that they would put all

contents of the home on the street and that they would store the furnishings once they received

payment. No Payment was made as this was an act of extortion and known to be crimes in

progress at the time of the event.

James Granitzas defendant, owner of We Haul with his wife acted as if they had full authority to

trespass, whereby the wife of James Granitzas entered the home with a clip board. James

Granitzas threatened and intimidated James J. Carroll, III with Officer Hughes by his side as the

Arlington Police falsely arrested the plaintiffs detaining them and holding them in detention

outside of their home. James Granitzas demanded keys to the home and cars demanding the

knowledge and location of the existence of any guns. James Granitzas lived on the same street

called Nahant Ave. in Nahant where the defendant Costantino has real estate.  The defendant

Dube, owner of Herb's locksmith in Arlington, removed high security locks under Federal Patent

Protection. The locks were Medeco Locks requiring restricted keys which are unlawful to

duplicate without authorization. Medeco was alarmed when a false blank was returned by this

locksmith which was a copy of a patented key of an unknown metallurgy not used by Medeco.

Herb's Locksmith was not a licensed Medeco Dealer and a Credit Card like identification card

40 A. Cont'd  must be used with identification by Medeco requirements to copy or produce keys

to the locks. These are burglarious crimes. Individuals stood on top of cars in the garage

damaging them. The cars were used as step stools  to restore power to  automatic garage doors

that were locked and disabled. At the time of break in retained counsel was contacted who played

along with the scheme and pretended that he had to file a case in Federal Bankruptcy Court to

stop the action.

B. The Town Counsel John Maher was called who also pretended all was legal and stated he was

going to advise police not to enter the home and thereby requested counsel for the plaintiffs to

call him and or fax any papers to him.  Officer Hughes attempted to help James Granitzas take an

auto belonging to James J. Carroll, III, a Volvo 240 sedan presenting a false title in the name of

James J. Carroll, Jr. This was auto title fraud, identity fraud, public records fraud, conversion,

identity fraud and an attempted car theft. Police seeing that the car was registered back down and

disuaded James Granitzas from taking any other action. This is conspiracy and aiding and

abeitting in crime.

C. Upon police leaving, some of the individuals were confronted and were advised that they

could be subject to suit.  Town Counsel was called to advise of the events asking how damages

would be addressed. The defendant John Maher called leaving a message on tape that quote,

"He did not give anyone permission to break down doors, break the law and or to enter anyone's

home." unquote.

D. Although each individual was a willing participant, each of those confronted passed

the blame to James J. Carroll, Jr. and Dr.  David Khoury claiming the doctor said nothing was

wrong with Josephine Carroll.  All acted smug, laughing as if they had fooled the plaintiffs.

The doctor was called to verify this claim and Dr. Khoury adamantly refuted the allegation

admitting being contacted, but heatedly insisting that he told the individuals to quote, "Stay away

84

40 D. from Josephine Carroll and leave her alone because she was a medically sick woman"
unquote.

E. This conversation followed attempts by Arlington Police and Arlington Fire appearing with a Rescue truck attempting to coerse Josephine Carroll into the rescue vehicle after berating her, harassing her, reaching into her pocketbook and removing all contents taking her keys to the home and autos and after opening closed medications and removing hands full which can only be assumed for an devious purpose such as murder with an overdose. Josephine Carroll refused the transport knowing that she was a victim of serious crimes of a group of criminals betraying her and the public trust. The trauma of events including taking her into the February cold with only nightclothes caused her hyperthermia which could have proven fatal with an elder and a heart condition as well as medications which lower blood pressure making her require a warm environment. Josephine Carroll did encounter trauma where upon this incident caused her a mild shock temporary affecting speach.

F. The incident was immediately reported and faxed to Jane Fitzpatrick at the Office of the Middlesex District Attorney. Immediately after her responses were nervous, hurried and dismissive refusing to address any issue stating only quote, "I'm sorry, I can not help you pushing out the plaintiffs from the office and intercepting any call to the office and continuing this conduct. Contacting members of this office more recently, they questioned these responses and stated there are ample grounds for criminal prosecution and to resubmit the issues.

G. Through these events, Josephine Carroll attempted to obtain criminal restraining orders receiving threatening letters. Justices Singleton and Merrick refused to protect Josephine Carroll when the law merely requires a person to be in fear for their safety.

This was once again a denial of all basic rights and protections where bias was clearly demonstrated. Justice Sprague had entered 10 day orders which these justices would not uphold and at least for Justice Singleton he was clearly connected to the criminal plot. The actions of the

*85*

other two justices clearly did not make sense when Justice Sprague realized something was very wrong and he never saw the activities sanctioned before the courts being called law and noted that fact vocalizing it to Josephine Carroll and James J. Carroll, III.

40 H. The defendant Costantino followed these actions with sending papers to the plaintiffs to taunt stating, that he was charging his client for quote, "contacting the court in advance of the proceedings" unquote, for this restraining order complaint.

I. The defendant James J. Carroll, Jr. followed the staged eviction actions which were scoping out the premises for future assault, with his taunting letters written on a Boston Chicken Box stating, "Thank you for playing the Larry gets the birdie game. Sorry, you are not a winner." The defendant James J. Carroll, Jr. added, quote, "Deal with the consequences" unquote. The defendant has written many bizarre letters and has been subject of many complaints from the public especially woman who claimed the defendant James J. Carroll, Jr. Stalked them and attempted to gain entry into their homes at night placing them in fear. They complained of similar denial rights by the courts with the same attorneys.

Threats followed from the defendant James J. Carroll, Jr. ordering removal of automobiles as if he was the master of the his exwife and son demonstrating papers he obtained from Town Counsel by his written admission. The defendant also threatened to terminate public water operation to the residence of Josephine Carroll and demanded bills for water usage at 7 Oldham Road paid. This again is unlawful. This is also control and acting like King of the Castle ordering a divorced spouse to follow unlawful demands. That is domestic abuse and crime.

J. The Arlington Assessor John Billafore changed the tax bill claiming that the defendant demonstrated papers that the property belonged to him. The Assessor, Police, Town Counsel and Selectmen were all given the true facts where all ignored the rights of the plaintiffs to work a predesigned course.[Emphasis]

86

40.K. One can not gain title to property that he could never gain title to regardless of any legal maneuvering. The facts are clearly crime and fraud and rigged documents and actions of conspiracy to defraud. [Emphasis]

L. The Tax department was informed that the actions were void by law for many reasons and fraud could not be used to change titles of parties never sued. [Emphasis] Complaints were made to the Attorney General who refused to address anything.

An Arlington tax clerk corrected the illegal changes realizing the change was improper, and the Tax Collector, the defendant Billafore her superior despite notice and former conflicts, changed the tax bill to the name of James J. Carroll, Jr. Claiming that the Land Court changed the title. Processing of Registered Land titles with new certificates customarily take over two years to process demonstrating that this was a blatant lie. The Assessor overstepped the rights of the Plaintiffs and this was not the first time.

M. Frequent drivebys from Police occurred at the residence of Josephine Carroll including entering the driveway at 10:00 p.m. blocking the exit of the plaintiffs whereby the cruiser then sped away. These actions were unlawful criminal trespasses, unlawful stalking and surveillance and were a part of the covert activities that were ongoing. Oldham Road, a private way is solely private property owned as a tenancy in common by residents who never had called police at the time of these incidents. The street was posted with no trespassing signs as was 7 Oldham Road making the events criminal and civil trespasses as one must be an "invitee or licensee" on official business to enter private property by law and no permission, invite or license was granted on any of these occassions. Police can only enter private property when called as a licensee or invitee or on official business as a licensee. The issues are matters of liability as well as crime and torts. Any use of a private way by law for any prescribed time must be reduced to contract for a sum certain and a specified time not to exceed 30 years by law on Registered Land, the best and allegedly safest form of title in the Commonwealth of Massachusetts. The court should then

$87$

consider that when the law becomes the criminal element, and it is used against the rights of the public for private gain, all law, descency, protection, morality and rights, all in totality becomes moot.

40 N. Inquiry with the Police Chief for several of these occurrences were claimed to be something he knew nothing about. Complaints to the defendant Frederick Ryan the Arlington Police Chief as well as the Selectmen continued to be ignored. The Police Chief responded arrogantly that quote, "He would be the person to decide if his officers did anything wrong and if we thought that anything was an unlawful act by his officers, then report it to the Attorney General." This raises a question of where should the law be enforced and who is responsible for injuries and the escalation of crimes and torts. Again this can be a 42 U.S.C. s 1983 issue.

O. The defendant Costantino continued to network the system obtaining alleged orders to change the locks and enter the home of a divorced spouse, a crime, (domestic abuse and a court sanctioned criminal break and entry into a private residence of legal strangers) stating that he would give Josephine Carroll copies of keys to her home an absurd action that enraged the insurer who said that private property should not be subject to public record or loss and that many privacy issues were in jeopardy as they believed this was an illegal act. This is like placing the fox into a chicken coop. The defendant Costantino had appeared before a justice Peter Agnes an Everett native whose family formerly had personal relations with members of blood relatives of Josephine Carroll. The judge refused to accept evidence and arguments or requests for a stay to have an attorney approach the court. The defendant Costantino before this judge who is from the same area where the defendant has an office claimed that Josephine Carroll and James J. Carroll, III were defaulted because they had not answered his interrogatories. The judge was advised by James J. Carroll, III that this was incorrect because the answers were hand delivered to the clerk of the court, filed in the docket which the clerk acknowledged but suddenly were missing from the docket. Moments later the defendant Robert

88

40 O cont'd. Costantino read from the same missing interrogatories he claimed were not answered whereupon the judge and defendant Costantino exchanged glances and smiles and then the judge retorted "One can not stop the wheels of justice just because you want it to stop." Requests to have counsel to address a hearing on the merits were then obstructed denying due process of law. This was a blatant denial of due process and more rigging of legally void actions with the appearance of bias and conspiracy and clearly complicity to conduct crimes against the public and private citizens committing an unlawful intrusion into one's private domain. This is abuse of power and intrusion by government and regardless of case precedents is unlawful and contrary to the Constitution and Bill of Rights. Again fraud and conspiracy was given precedence over lawful rights and protections with no legal foundation. An individual can not stop criminals where the law is subverted for crime, conspiracy, networking and coverup. These actions again were violations of the Permanent Injunction of No Contact and no interference with liberties or property rights and since the order already restrained Robert Costantino, his client James J. Carroll, Jr. their counselors agents and third persons, the order also applied to members of the court as well as law enforcement or anyone defying that order. It is a contempt of court and a criminal offense. Such criminal offenses are supposed to be addressed by statute by the Attorney General who asserts that he prosecutes such actions under the False Claims Act. The refusal of that office to uphold the law and these court orders that were premier is negligence and neglect of duties.

P. At Bankruptcy Court. Josephine Carroll was made to appear as owing a debt for the alleged Lowell Judgement by default. Josephine Carroll testified that she did not owe anyone anything except her son James and that the claims of James J. Carroll, Jr. were bogus. Josephine Carroll testified that James J. Carroll, Jr. was actually a debtor to Josephine Carroll, not a creditor. It is a crime to make false statements to the Federal Government ; to file false cases and to claim one is a creditor when they are a debtor. This is fraud and a Federal crime.

89

40 P cont'd. Justice Kenner finding that no claim existed in Bankruptcy action 02-0111 dismissed the bankruptcy action. It is a crime to allege one is a creditor when one is actually a debtor. The filing in Bankruptcy Court damaged the A-1 credit of 50 years of Josephine Carroll making it difficult for her to obtain any credit on which to secure housing once she was made homeless. Again these are crimes and this was one more attempt to compromise an estate and batter or murder an elder.

41. On or about June 28, 2002, a fired attorney named Evan Greene appeared at 7 Oldham Road with Arlington Police who then summonsed Arlington Fire. Evan Greene was seen pacing nervously while talking on his cellular phone. Evan Green found a business card from Federal Bureau of Investigation Agent Marshall Stone. The surveillance system made it possible to see the behavior and hear the comments of this attorney who stated, quote, "The F.B.I. was here. How are we going to handle this. What are we going to do." The attorney was accompanied by Arlington Police officer Bassett, defendant who then allowed a plain clothed fireman to enter the residence of 7 Oldham Road, a break and entry and a trespass. The man John Doe defendant entered through a third story attic window. The man walked down two floors of stairs and approached Josephine Carroll from behind, surprising her, startling and nearly frightening her to death. The man demanded keys to open doors and was advised to leave the way he came. The man walked out through a service hall as if he knew the residence well. The attorney lied to Josephine Carroll claiming her son was outside. Josephine Carroll in fear for her safety called her son James at his employer who realized something was terribly wrong because Josephine Carroll was so upset that she was nearly incomprehensible. Josephine Carroll chastized the officer who said quote, "We will not help you anymore." unquote. The excuse of the visit was that the attorney could not reach Josephine Carroll and they were concerned for Josephine Carroll. A bad joke considering the licensed crimes the Police had participated in regularly. A complaint to

90.

Selectmen, Town Counsel and the Town Manager was ignored. A complaint was made to Miss Baron at the Human Rights Commission who agreed that these individuals had created many issues which were very wrong and could be grounds for suit. (Documented.)

42. On or about August 3, 2002, alarms sounded at 7 Oldham Road Arlington triggering outdoor flood lamps as an Arlington Police Cruiser sped away at 2:30 in the A.M. A notice was affixed to the door which was not there earlier. The notice alleged an eviction which was to occur on August 5, 2002. Police are not allowed to make service, nor can service be made on weekends, holidays or beyond the hours of 8 a.m. through 5 p.m. Monday through Friday. No hearings or advance notice was given. By law for many reasons Josephine Carroll could not be evicted from the premises. Any attempt to do so is no less than a crime.

43. On August 5, 2002, the defendant James J. Carroll, Jr. appeared at 7 Oldham Road Arlington with Deputy Sheriffs Donnelly, Faye, Breen and a female deputy believed to be deputy Deyoung defendants. This followed an Arlington Police Officer who was never called coming to 7 Oldham Road and scoping out the property. Under no circumstances were any of these individuals allowed to be at 7 Oldham Road Arlington with a NO CONTACT ORDER of PERMANENT RESTRAINT. [Emphasis]

No Eviction can legally occur between divorced spouses where neither side is allowed to interfere with the estate of the other onced divorced by law. There was never any contractual land lord relationship and no valid eviction. Personal possessions and contents of a home can not be taken under valid evictions when parties are present. The eviction laws, process of service laws and the law in general does not allow excessive force, deadly force, kidnapping, injury, assault and battery, especially on a woman and a person over age 60 which is a felony. The law does not allow theft, conversion or the taking of any personal possessions, as this is prohibited under M.G.L. 239 section 4 of Massachusetts law and many other statutes and the total consensus under the circumstances is that conspiracy, crime, theft by trick or deception is

9/

43 cont'd. at the basis of all events. Again that is a crime.

No Execution, papers of any type, warrants or appearance of any legal basis was made at time of forced breakin. [Emphasis]

Under Massachusetts law even those who can claim to be landlords can not by law retalliate against a tenant when such a relationship exists which did not.

When no legal basis is allowed to take property of another and false documents and conspiracy is operated to conduct kidnapping assault, conversion and robbery with many other forms of fraud, then all is a crime and a civil torts. The court is asked to note that as an example, no one can owe someone a debt, devise a scheme to ignore that debt, defraud and seriously injure a party to who the debt is owed and make a winfall with all the associates who aided in the injury and abuse to enrich themselves with a six fold theft of assets of any party that could be deprived of them in the process. That is not law, that is racqueteering and organized crime activities.

The court is asked to note that payola has been found made to the Office of the Middlesex Sheriff in unusual amounts and unusual circumstances to cover the orchestrated and premeditated acts.

The Court is asked to note that this Armed Robbery and Armed Home invasion and akidnapping, a violation of Federal Law posed as color of law was directed by deputy sheriff Steven Donnelly who has aided and abeitted James J. Carroll, Jr. the defendant with others after receiving bribes in his prior criminal activities and assaults devised with the defendant James J. Carroll, Jr. (See Conclusion of divorce January 1990, rulings of fraud by Probate Court.)

The court should realize that the events continued because no one enforced the law as it was intended and when one can not rely on the police, the courts, the lawyers who are part or subject to the same corruption and one is under constant attack, as an individual who has been deprived of their home, all their assets, their subsistance and any form of safeguards or protections, an individual in such a circumstance is at the mercy of the criminal element and can not fight against an army. The Court should also note that corruption is nothing new to America and

43 cont'd that no American citizen enjoys making allegations of corruption, fighting corruption or being a victim of it. The court is asked to consider that if an individual can overcome these odds and the injuries, proper enforcement of the law can become clouded and distorted with added layers of manipulations, threats, assaults, added costs and injuries when the aggressors continue unpunished. The plaintiffs have documented many events with witnesses and considering the added opportunities of the defendants working in concert with one another the court should understand the obstacles, the injuries, the loss and duress the plaintiffs have endured and the abilities of the defendants collectively to place the plaintiffs in fear for their safety, security and welfare while the aggressors have continued unchecked and unchallenged to therefore use their resources to cause their victim[s] more harm including the ability to use weapons, false imprisonment, fines, penalties and court costs, coupled with unlawful assaults such as vandalism, libel, slander and defamation of character to name a few of the elements that exist in this case.

The court is most certainly cognizant that when networking and enforcement of crime is given righteousness over true law while as a victim, the individual is stripped of their rights, taunted, toyed with, battered, imprisoned and harassed, one can not have faith in a system that rewards crime, deceit, setups, treachery and destruction of all American Moral values while it gives protections and and cover with state sanctioned victimization, excuses and retalliation for lawful exercises under the U.S. Constitution. When all of this is crime by law, then one experiences some of the same attrocities that the jews experienced in Nazi Germany. Greed and abuse of power knows no boundaries. The court certainly realizes that criminally activities such as those presented give rise to other criminal activities and ultimately the defrauding of the U.S. Government and the taxpayer. As a U.S. Citizen and in defense of One's country it is the legal obligation of the plaintiffs to seek remedies under the law. To allow such activities to continue without accountability is to betray the public trust, the laws of the United States, to betray any

93

form of true justice and abash the United States Constitution.

44. On August 5, 2002, a plain clothed locksmith pryed and forced open doors, deputies sheriffs forced their way in and physically accosted, battered and seized both plaintiffs giving them blackened bruises on their arms. Each plaintiff named in the instant action was physically picked up off the ground and thrown out of their home. In the process deputy sheriff Donnelly removed keys and a checkbook reaching into the front pocket of the pants of James J. Carroll, III physically and sexually assaulting his person. Donnelly denied thereafter that he took keys and a checkbook when James J. Carroll, III saw him with his own eyes and experienced this trauma. Outside a deputy assumed to be deputy Breen held the plaintiffs Josephine Carroll and James J. Carroll at bey holding their hands on their guns threatening arrest if they resisted. The plaintiffs feared if they took the law into their hands being legally justified to do so, that they would be murdered, or jailed and prosecuted as everything else was devised through crime, fraud and coverup. At this point the plaintiffs realized that their lives would be forever changed.

45. On August 5, 2002, neighbors stopped at 7 Oldham Road Arlington, Massachusetts asking how these events could occur realizing as lay persons none of these events could be legally justifiable. Again one can not receive justice where alternative agendas exist and justice does not exist for the intended victims. Stunned neighbors chastized the deputies. The deputies acted smug and thought all was humorous. A 9 room custom Georgian Colonial which had custom and costly irreplaceable items throughout was stripped of all contents. Triple M Movers, appeared with [3] three super long Tractor Trailers. Blacks and hispanic males entered the home with the group removing all contents. Triple M was previously exposed on a NBC Dateline Investigation as having a ghost owner, involved in alleged crimes in thefts of property and found with ties to the New York Garbage Syndicate.

A. Well over $500,000.00 of heirlooms, fine furnishings no longer available some of which were costly antiquities, oriental rugs, collections, clothes linens, beds and every item that makes up a home was taken. The Office of the Middlesex Sheriff occupied the home for over 24 hours with official vehicles parked in the driveway. The food of the plaintiffs was thrown into the street immediately perishing in the August sun. The plaintiffs James J. Carroll, III and Josephine M. Carroll were kidnapped from their home forced out of it on crime and total fraud and false action orchestrated with the participants who all benefitted from the spoils taken in the commission and enforcement of their fraud posed as law.

46. The Office of the Middlesex Sheriff as a state agency is accountable to the state of Massachusetts and is clearly liable for the enforcement and the preorchestated conspiratorial participation in a swindle in violation of the Lavein Law and is responsible for the issues of abuse of power, excessive force, unlawful intrusion, privacy invasions, the criminal assaults, the thefts, the identity theft and identity fraud on forged checks and credit card fraud that followed are issues of civil rights violations, fraud, crimes against the currency, violations of U.C.C. , VAWA and essentially a violation of RICO. The court is asked to note that papers were created to allege legal basis and suits fabricated with false records that never operated according to law, court rules, juristiction notice or having an assemblance of lawful proceedings. Therefore the entire basis of justification is nothing more than organized crime and false papers many of which have been revised or changed after the fact including docket sheets of alleged cases which again were created on total fraud and violation of law.

When something is clearly prohibited by law, false papers, false contracts and alleged fabricated and fraudulently devised orders can not overstep valid law, valid court orders, valid records and valid legal rights. Some of the alleged orders were created by clerks, attorneys and the defendant James J. Carroll, Jr. and nothing that relies on the legal basis of the defendants is a valid defense against a pyramid scheme, ponzi scheme or a crimal plot that amounts to racqueteering.

95

47. Upon contacting the police, the Arlington, Police, Town Counsel, the District Attorney, the courts and the Attorney General would do nothing calling public integrity issues and corruption interwound with domestic matters a civil issue and a private matter. This is without contest a breach of public duty where the Massachusetts authorities at all levels have failed to enforce the law.

48. Per admission of Everett Murray of Triple M Movers of Brockton, the defendant James J. Carroll, Jr. took what he wanted of property and gave tools and other items to his son Richard as well as his daughter Joanne Carroll Deyoung.

This is receiving stolen property and aiding and abeitting crime.   Everett Murray, the defendant DBA/ Triple M Movers thereafter became abusive and threatening refusing to return stolen property, a crime and attempted to extort more and more money up to $10,000.00 threatening sale of the items he claimed to posess. When attempting to recover the property, excuses for delays were encountered and the demands increased. It is the belief of the plaintiffs that this was both extortion and a diversion as the assets were delivered to other locations other than where he claimed which was Stoughton Massachusetts in an undisclosed Warehouse location found to be unknown to Police and Town Officials. These individuals raised questions with the licensing number 1111.

49. Arlington Police refusing to enforce the law or provide any protection, the plaintiffs could not return to their home which was a crime scene, where the defendant James J. Carroll, Jr. had taken adverse possession on Registered Land, a criminal trespass with the defendant attorneys John Gahan, III, Robert Costantino, John Maher and Thomas Vangel as well as members of Land Court on who prepared and enforced a "void title" on total fraud compiled and devised by them [Emphasis] This is a title that holds no weight by law, as it is an invalidly procured title which is no more than fraud. It is clearly conversion since the true title holders were never sued and never subject to legal detriment or any alleged legal action that resulted thereafter.

Josephine M. Carroll    96